[No. C049060. Third Dist. Jan. 25, 2006.]

In re STEVEN BURNS on Habeas Corpus.

COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Stephen P. Acquisto and Krista L. Pollard, Deputy Attorneys General, for Appellant.

Heather MacKay, under appointment by the Court of Appeal, for Respondent.

OPINION

**MORRISON, J.**—Petitioner Steven Burns is serving a term of 15 years to life following his 1980 conviction of second degree murder. In October 2002, the Board of Prison Terms (now Board of Parole Hearings; hereafter Board) determined that Burns was not suitable for parole and deferred further consideration of parole for five years on the ground that it was unreasonable to expect Burns to be found suitable for parole within that period.[1]

On Burns's petition for writ of habeas corpus, the trial court found the Board had no reasonable justification for deferring parole consideration for five years. The court ordered issuance of a writ directing the Board to amend its decision to reflect a deferral period of three years, and to place Burns on its October 2005 hearing calendar.

On appeal, the Board contends the order for writ must be reversed because (1) some evidence supports the five-year deferral and (2) alternatively, the court should not have ordered a three-year deferral and instead should have directed the Board to reconsider its decision. For reasons we shall explain, the first contention has merit and requires reversal of the judgment (order).

### FACTUAL AND PROCEDURAL BACKGROUND

*The murder*

Eighteen-year-old Burns had enjoyed a long and close relationship with 19-year-old Katina Salarno and her family. However, during an argument in August 1979, Burns threatened to kill Katina. At about this time, a pistol was taken from Katina's father's store where Burns was employed.

---

[1] For clarity, we shall refer to the parties as Burns and the Board. (See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1075, fn. 3 [23 Cal.Rptr.3d 417, 104 P.3d 783].)

About 3:00 a.m. on the day before Katina was to start college, Burns awakened her and her younger sisters by throwing rocks at their bedroom window. They looked outside and saw him return to his house across the street. Then, their telephone repeatedly rang one time and stopped. Katina spoke to Burns during one call and became frightened. After a few minutes, the girls heard what appeared to be the sound of someone climbing the wall of their home. They then saw Burns running back across the street to his house. Later that day, the Salarno family attended a barbecue at a relative's house in Stockton to celebrate Katina's entry into college.

The next day, as the Salarno family checked out of their Stockton hotel, Katina saw Burns in the hotel lobby and asked her father, "what's he doing here?" Katina looked confused and stressed by Burns's sudden appearance. When asked, Burns said that his enrollment at the college was a "surprise." Burns had an unfamiliar look on his face when he said that.

At 6:00 p.m., the Salarnos kissed Katina goodbye and left for home. When it became dark, Burns called Katina at her dorm room to arrange a meeting. She had decided that she no longer wished to date him and wished to devote her energies to her studies. As she left for the meeting, she prophetically told a roommate that she was going to meet Burns "for the last time." The meeting place was in a dark and isolated area. During the meeting, Burns shot Katina in the head using the gun he had stolen from her father. Burns later claimed that he had spent the evening watching Monday Night Football.

Burns's version of the murder changed over time. When first questioned, he denied any involvement. The next day, he claimed Katina struck him with her fist, pulled out a firearm and fired at him; he was unclear as to how many shots were fired, whether he was shot and how she was shot. Burns later admitted taking the gun from the store; he claimed Katina hit him and he shot her as she walked away. Still later, he claimed she pulled the gun from her purse; they struggled and the gun accidentally discharged. Finally, in a 1995 psychiatric evaluation, Burns stated that he carried the gun in order to "be impressive"; as he argued with Katina, he "went into outrage, lost control, and then shot her."

*Parole proceedings*

Parole consideration hearings were conducted for Burns in 1990, 1992, 1994 and 1995. At the next hearing in 1998, the Board denied parole and deferred parole consideration for four years. Burns was instructed to become discipline-free, and to participate in self-help and therapy as available.

Four years later, on October 1, 2002, the Board conducted the hearing that is the subject of this appeal. Burns appeared by counsel but not in person. Four members of Katina's family attended, as did a deputy district attorney, a victims services representative and several observers. In addition, 58 victim advocates from across the state came to the prison where the hearing was held. Katina's father presented approximately 2,000 letters and 10,000 signatures on a petition opposing parole.[2] The Board also considered several letters from public officials opposing parole.

The Board concluded that Burns was not suitable for parole because his release would pose an unreasonable risk to the public. In support of its conclusion, the Board found "[t]he offense was carried out in an exceptionally cruel, callous, or violent and brutal manner. The offense was carried out in a dispassionate manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and life." To support these findings, the Board reiterated its statement of facts, which we summarized *ante*. The Board noted that Burns had "told a number of stories" regarding the facts of the case.

The Board noted that Burns had received a variety of psychological diagnoses over the years and that he "has not sufficiently participated in meaningful therapy programming." The Board criticized a 1998 psychological evaluation for claiming that Burns had "never incurred disciplinary reports," when in fact Burns had incurred a "very significant disciplinary report" after sending his semen through the mail to an inmate with whom he had had a sexual relationship.

The Board found that the letter containing the semen was "very specific in regards to [Burns's] desire to control this other inmate and pleads with that inmate and makes statements such as, to death us do part and again, I'm begging you not to," by which Burns was "trying to prompt this individual not to leave him." This letter, along with others that Burns wrote to the inmate, were significant to show that Burns had "this possessive nature . . . which seems to go hand in hand with the possessiveness he showed with the victim prior to the murder and up to the time of the murder." The Board read excerpts of the letters into the record.

The board further found that Burns engaged in the same sort of stalking behavior when he sent a series of 23 letters to Katina's father, who is also Burns's godfather, even after family members asked and told Burns to leave them alone. Katina's father described the letters for the record. In one letter, Burns stated that he would appear at the 2002 parole hearing by counsel but

---

[2] Following the murder, members of Katina's family became advocates for victims of crime.

not in person; added that, if released on parole, he would live with his grandmother in the same neighborhood as the Salarnos; and invited Katina's father to meet with him at the prison.

The Board found it "hard to understand" why Burns, who had undergone psychological counseling for so many years, still engaged in stalking behavior as late as 1996 or 1998. The letters demonstrated that Burns needed additional time for psychological "evaluation." Thus, the Board found: "[Burns] needs additional time in order to fully understand and deal with the causation factors that led to the commitment of the [murder]. He needs therapy in order to face, discuss, understand, and cope with stress in a non-destructive manner. Until progress is made, [Burns] continues to be unpredictable and a threat to others."

In a "separate decision," the Board found it was "not reasonable to expect" that parole would be granted at a hearing during the following five years. After reiterating the facts of the offense, the Board again found that Burns committed the offense in an exceptionally cruel, callous, violent, and brutal manner. The Board further found that Burns has a "history of unstable or tumultuous relationships with others," as shown by the murder, the letters he wrote to the other inmate, and the letters he wrote to Katina's father. The Board found that Burns's most recent psychological evaluations, in 1998 and 2002, were of no value because they did not address the issues raised by Burns's letters. The Board concluded "a longer period of observation" of Burns was required before it could find him suitable for parole. The Board requested an investigation to determine whether the letters Burns sent to Katina's father were rule violations. The Board also requested a new psychological evaluation addressing the letters to the inmate and to Katina's father.

### Trial court proceedings

In August 2004, Burns filed a petition for writ of habeas corpus alleging, among other things, the Board improperly deferred further consideration of parole for five years.

The trial court found that the record did not entirely support the five-year deferral period, particularly in that the Board's recommendation for additional psychological testing may be accomplished in a much shorter time. The court issued an order to show cause, requiring a written return explaining "why the 5 year deferral period should not be vacated and set aside and a more appropriate period of 3 years be imposed."

After the return was filed, the court confirmed its initial ruling. The court found "the imposition of the 5 year period was an abuse of discretion and is not supported by the record. Specifically, given the [Board's] recommendations for the next hearing, the [Board] has failed to establish any reasonable basis on which to conclude such matters cannot be completed within a 3 year period and furthermore, offers no reasonable justification for the 5 year deferral." The court ordered issuance of a writ directing the Board to (1) amend its October 1, 2002, decision to reflect a three-year deferral period, and (2) place Burns on the October 2005 parole suitability hearing calendar.

The Board timely appeals. In February 2005, this court denied the Board's petition for writ of supersedeas. However, we subsequently stayed further proceedings on the trial court's order.

## DISCUSSION

The Board contends parole decisions are reviewed under the deferential "some evidence" standard, and the trial court's order granting writ relief must be reversed because there is some evidence to support the five-year deferral period. In a separate argument, the Board contends that, if the evidence does not support a five-year deferral, the proper remedy is to remand to the Board for determination of a proper deferral period, rather than to order a three-year deferral. For reasons we shall explain, the Board's first argument has merit and its second argument need not be considered.

### Statutory and regulatory framework

When considering parole for an indeterminate life inmate, the Board first determines suitability for parole. If it finds the inmate suitable, the Board establishes a parole release date. (Pen. Code, § 3041, subd. (a); Cal. Code Regs., tit. 15, § 2402, subd. (a); see *In re Dannenberg, supra*, 34 Cal.4th at p. 1091.) Conversely, if the Board concludes that public safety requires a lengthier period of incarceration, parole will be denied. (Pen. Code, § 3041, subd. (b); *In re Dannenberg, supra*, 34 Cal.4th at p. 1091.)

In making this determination, the Board considers "[a]ll relevant, reliable information available," including the circumstances of the inmate's social history, past and present mental state, past criminal history, the commitment offense(s), the inmate's attitude toward the crime, and any other information that bears on the inmate's suitability for release. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

If the inmate is found unsuitable and parole is denied, the Board must conduct subsequent parole consideration hearings annually. There are two exceptions to annual review; one is relevant here. (Pen. Code, § 3041.5, subd. (b)(2).) If the inmate has been convicted of murder, the hearing may be deferred for "[u]p to five years," if "the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years . . . ." (Pen. Code, § 3041.5, subd. (b)(2)(B).)

■ The Board's decision to defer the annual hearing must be guided by the same criteria used to determine parole suitability. (Cal. Code Regs., tit. 15, § 2270, subd. (d), citing *id.*, § 2402.) Thus, the reasons for refusing to set a parole date need not be completely different from the reasons for excepting an inmate's case from annual review. "The latter decision involves a prediction that at least during the period of the postponement, an inmate will not likely become suitable for parole. That prediction may involve some of the same facts on which the unsuitability determination is based. What is required, however, is an identification of reasons which justify the postponement." (*In re Jackson* (1985) 39 Cal.3d 464, 479 [216 Cal.Rptr. 760, 703 P.2d 100]; cf. *People v. Belmontes* (1983) 34 Cal.3d 335, 347 [193 Cal.Rptr. 882, 667 P.2d 686].)[3]

■ Under the Board's regulations, "Circumstances Tending to Show Unsuitability" for parole include "The prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) When determining whether the offense was especially heinous, atrocious or cruel, the Board considers several factors, including one that is relevant here: "(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(B) & (D).) The factors described in the regulations are "general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to" the judgment of the Board. (*Id.*, § 2402, subd. (c).)

Another circumstance tending to show unsuitability is "Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3).)

In addition to the nature of the commitment offense, the Board may consider any other information that bears on the inmate's suitability for release. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

---

[3] We thus reject Burns's principal contention that "[r]easons for deferring the next hearing must be different from those for denying parole." We also reject his subsidiary contention that the Board's regulations are invalid to the extent that they allow it to rely on the same reasons to deny parole and to defer the next hearing.

*Analysis*

■ "[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but . . . in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law. [Citations.]" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 [128 Cal.Rptr.2d 104, 59 P.3d 174], fn. omitted.)

As noted, the Board found, in "a separate decision," that it was not reasonable to expect that parole would be granted at a hearing within the ensuing five years. In so finding, the Board relied in part on one factor related to the commitment offense and one factor related to Burns's relationships with others.

The Board first found that Burns committed the offense "in an exceptionally cruel, callous, violent, and brutal manner." (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Specifically, the Board found that Burns committed the offense in "a manner which demonstrates an exceptionally callous disregard for human suffering and life." (See Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).)[4]

The record contains "some evidence" that Burns committed the murder in a manner that demonstrates an exceptionally callous disregard for human suffering and life. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D); *In re Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

There was evidence that, after luring Katina to an isolated spot and shooting her, Burns did not summon help or stay to help her. Instead he walked away, climbed the stairway of his dormitory building from which

---

[4] The regulation states in relevant part: "(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include: [¶] (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] . . . [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(D).)

Katina might have been visible, and entered his dorm room, where he lay down on his bed and may have joined his roommate who was watching Monday Night Football. Meanwhile Katina, who had been shot between 7:00 and 8:00 p.m., was not found until 9:45 p.m. When found, she was lying on her back and moaning. Her body had scratches indicating that she may have tried to obtain help. Katina was not pronounced dead until after midnight. Thus, Burns had approximately one to two hours in which he could have reconsidered his disregard for Katina's suffering and life, but he did not do so. (Compare *In re Smith* (2003) 114 Cal.App.4th 343, 367 [7 Cal.Rptr.3d 655] [no evidence the inmate unnecessarily prolonged pain or suffering].)

The Board also found that Burns has a history of unstable or tumultuous relationships with others. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3).) The record contains "some evidence" supporting this finding. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 658.)

The Board first noted that this factor was shown "by the instant offense." The Board found it was further shown by Burns's 1996 letter to the inmate with whom he had shared a sexual relationship. According to the Board, the letter "contains statements that show [Burns's] desire to possess and to threaten if he can't have his way and then make statements that—such as, to death do us part." The letter also made reference to Burns "being abandoned and left for dead, which . . . just conjures up the night of the shooting; if you abandon me and left me for dead." Finally, the Board noted that Katina's "father has been receiving letters also."

Because a hearing postponement "may involve some of the same facts on which the [parole] unsuitability determination is based" (*In re Jackson, supra*, 39 Cal.3d at p. 479), we may consider the Board's discussion of parole unsuitability for the purpose of illuminating the Board's reasons justifying the postponement.

After discussing Burns's letters to the inmate and Katina's father, the Board found "that [Burns] needs additional time for psychological evaluation." The Board commented that it was "hard to understand [why] an individual [who] has gone through psychological counseling as long as he has . . . still has this problem as late as 1998 or 1996."[5] Because the series of

---

[5] Burns contends his letters to the inmate and Katina's father, "which were sent at an indeterminate time in the past and which could have been, but were not, presented at the hearing," cannot justify the five-year deferral. Burns has forfeited this contention by advancing it without argument or citation of authority. (See *People v. Hardy* (1992) 2 Cal.4th 86, 150 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Wharton* (1991) 53 Cal.3d 522, 563 [280 Cal.Rptr. 631, 809 P.2d 290].) In any event, the claim has no merit. Excerpts of the letters were read into the record or summarized for the record.

letters to Katina's father extended beyond 1998 to the vicinity of the 2002 parole hearing, the Board could deduce that Burns still had a stalking problem notwithstanding several more years of psychological counseling. In short, there was *some* evidence supporting the Board's decision to defer parole consideration for five years. (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 658.)

The trial court's contrary finding appears to have been based, not upon the evidence as a whole, but upon the Board's "recommendations for the next hearing." The Board recommended that an investigation be conducted as to whether Burns's letters constituted prison rule violations, and recommended that Burns undergo a psychological evaluation that considers and addresses his letters. The trial court correctly noted that there was no reasonable basis to conclude that those two matters required more than three years to complete.

However, the Board's five-year deferral of parole consideration was not based solely on its desires for a new psychological evaluation and an investigation of possible rules violations. Rather, as we have explained, the Board properly considered that Burns's offense was especially cruel and callous and that his progress during many years of psychological counseling preceding the 2002 parole hearing had been demonstrably insufficient.

We emphasize that the Board sought a new psychological evaluation because the prior evaluations had overlooked evidence *supporting* the Board's conclusions that Burns was unsuitable for parole, and that future parole consideration should be deferred for five years. Burns does not contend, and the record does not suggest, the new evaluation would have been *more favorable* toward Burns than the prior evaluations. Thus, the fact the evaluation could be completed in less than five years does not suggest that the five-year deferral was unreasonable.

In sum, the evidence supports a finding "that it is not reasonable to expect that parole would be granted at a hearing during the following years . . . ." (Pen. Code, § 3041.5, subd. (b)(2)(B).)[6] Because the Board's decision had a factual basis and was supported by evidence in the record, Burns's habeas corpus petition should have been denied.

---

[6] Our conclusion is not based upon the magnitude or the quantity of opposition to parole expressed by the victim's family and members of the community. We need not consider Burns's contention that the Board improperly "gave in to pressure from those opposing . . . Burns's parole."

## DISPOSITION

The judgment (order granting writ of habeas corpus) is reversed. The trial court is directed to enter a new order denying writ relief.

Raye, Acting P. J., and Hull, J., concurred.

The petition of respondent Steven Burns for review by the Supreme Court was denied June 21, 2006, S142363.