[No. B209638. Second Dist., Div. Seven. Jan. 13, 2009.]

In re PAUL E. GAUL on Habeas Corpus.

## COUNSEL

Sean K. Kennedy, Federal Public Defender, John Littrell and Gail Ivens, Deputy Federal Public Defenders, for Petitioner Paul E. Gaul.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Charles Chung, Deputy Attorneys General, for Respondent State of California.

## OPINION

**PERLUSS, P. J.**—Paul E. Gaul pleaded guilty to second degree murder in 1991 pursuant to a negotiated plea and cooperation agreement and was sentenced in 1994 to an indeterminate term of 15 years to life. Both the district attorney and trial court recommended parole at the earliest possible time pursuant to the rules and regulations of the Board of Prison Terms (now the Board of Parole Hearings) (Board).

After denying parole on three occasions (in 1998, 2001 and 2003), the Board in 2005 found Gaul suitable for parole and set a release date. The Governor reversed the Board's decision in early 2006. In October 2006, after addressing the Governor's concerns, the Board again found Gaul suitable for parole. Once again the Governor reversed the Board's decision. Finally, in November 2007 the Board itself denied parole, concluding the nature of the commitment offense (murder for hire) and Gaul's unstable social history before the offense, as well as his purported failure to develop sufficient insight as to the magnitude of his crime and a continued need for therapy to cope with stress, made him unsuitable for parole "based on the unreasonable risk to society or threat to public safety if released from prison." Gaul filed a petition for writ of habeas corpus in this court, challenging the Board's decision on the ground it was not supported by "some evidence" and was otherwise arbitrary and capricious.

In *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) the Supreme Court reemphasized the highly deferential standard of review the courts must apply to parole matters, but explained "a reviewing court reviews the *merits* of the Board's or Governor's decision, and is not bound to affirm a parole decision merely because the Board or the Governor has adhered to all procedural safeguards." (*Id.* at p. 1210.) When, as here, the primary factor identified for denying parole is the nature of the commitment offense, the *Lawrence* Court held, "the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor." (*Id.* at p. 1221.)

Utilizing the *Lawrence* standard the Board's 2007 decision to deny parole, notwithstanding its 2005 and 2006 findings Gaul was suitable for parole, is not supported by any evidence rationally indicating Gaul poses an unreasonable risk of danger to society if released from prison. Accordingly, we grant the petition for writ of habeas corpus and order Gaul's release unless new evidence of his conduct in prison subsequent to his 2007 parole hearing supports a determination he currently poses an unreasonable risk of a danger to society if released on parole.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Gaul's Current Custody Status and Classification History*

Gaul is currently incarcerated in Avenal State Prison in Kings County. Since 1995 his custody status has been "Medium A," the least restrictive level of custody for a life-term prisoner. During his incarceration his classification

score has steadily declined (a lower placement score indicates lower security control needs); and in 2001 the score reached zero.

## 2. *The Commitment Offense*

Gaul was convicted in 1991, based on his plea of guilty, of the June 27, 1989 murder of James Bernstein. The murder was initiated by Mary Ellen Samuels, who offered Gaul $5,000 to kill Bernstein, who was then living in the same house as Gaul. Bernstein had previously killed Samuels's husband, Robert Samuels, at her request and was threatening to blackmail Samuels regarding the earlier crime.

According to the probation report read into the record at Gaul's November 8, 2007 parole hearing, Gaul and a second man, Darrell Edwards, who had been enlisted by Gaul, drove Bernstein in Samuels's car to a secluded area, purportedly to steal some cocaine. Edwards grabbed the victim from behind while Gaul slammed on the brakes. Bernstein struggled and managed to get out of the car. Both Gaul and Edwards fought with Bernstein and eventually strangled him. They then transported the body and dumped it in a remote location, where it was not discovered until nearly one month later.

## 3. *Gaul's Plea and His Cooperation in the Prosecution of Mary Ellen Samuels*

Pursuant to a negotiated agreement, Gaul admitted his involvement in the murder plot and promised to cooperate with the People and to testify truthfully at the death penalty trial of Samuels. In return, Gaul was allowed to plead guilty to second degree murder and sentenced to a state prison term of 15 years to life with a recommendation he be released on parole at the earliest possible time.

Rather than being immediately sentenced following his guilty plea in 1991, Gaul remained in the county jail pending Samuels's trial. As a result, he was not sentenced until June 4, 1994. The district attorney's letter to the court, prepared and submitted pursuant to Penal Code section 1203.01 and joined by the trial judge, described Gaul as having fully cooperated with law enforcement and the prosecution of Samuels since his early admission of guilt.[1] The letter also stated Gaul "continues to express extreme remorse for his actions

---

[1] Samuels was convicted of the first degree murder of Bernstein and Robert Samuels, soliciting the murders of both men and conspiring to murder both of them. The jury found true a financial-gain special-circumstance allegation as to the murder of Robert Samuels, as well as multiple-murder special-circumstance allegations. The jury returned a death verdict for each murder. The Supreme Court affirmed the judgment in its entirety. (*People v. Samuels* (2005) 36 Cal.4th 96 [30 Cal.Rptr.3d 105, 113 P.3d 1125].)

and fully and completely accepts responsibility for what he has done." The letter explained at the time of the murder Gaul was drinking heavily and using cocaine, and his brother had recently been killed, a death Gaul believed was somehow related to his brother's cocaine use. In soliciting Gaul to murder Bernstein, Samuels "seized on the fact that Mr. Gaul had just lost his brother to cocaine and told him that James Bernstein was a drug dealer who was selling to Jr. High students. Mr. Gaul was aware of the fact that Mr. Bernstein had arranged to have Robert Samuels killed." The letter concluded, "I believe that [Gaul's] behavior, while clearly criminal in nature, harmful to society and without any justification is somewhat mitigated by the circumstances of his life at the time. [¶] Please consider his early admission of guilt, his total remorse, his full and complete cooperation with law enforcement, his voluntary waiver of time for sentencing . . . , together with his minimal record, in granting him the earliest possible parole date within your guidelines and wisdom."

### 4. Gaul's Parole Hearings

#### a. The initial hearings

At his initial parole consideration hearing in 1998, Gaul was found unsuitable for parole; parole was denied for a three-year period. Gaul was again found unsuitable for parole at a hearing in July 2001. Gaul challenged the 2001 denial by a petition for habeas corpus, which was granted by the Los Angeles Superior Court. The court ordered the Board to conduct another suitability hearing and to reach a parole determination "in conformity with the following guidelines: [¶] (1) It should consider the gravity and the public safety implications of Gaul's offenses as they compare with other similar offenses and in light of the terms prescribed by the legislature for such offenses. [¶] (2) The Board should consider Gaul's psychological profile as a factor favoring his application for a parole date, unless a new psychological evaluation supports a different conclusion. [¶] (3) The Board should also consider Gaul's work history and education achievements during his years in prison as factors supporting his release." This court reversed that decision in an nonpublished opinion, applying the governing "extremely deferential" standard of review articulated in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), and concluding "the Board's decision finding petitioner unsuitable for parole is supported by some evidence." (*In re Gaul* (May 15, 2003, B161692) [nonpub. opn.].)

#### b. The September 15, 2005 hearing finding Gaul suitable for parole

Following another denial of parole in September 2003, at Gaul's fourth parole hearing on September 15, 2005, the Board found Gaul suitable for

parole and set his release date. Evaluating Gaul's progress since its denial of parole two years earlier, the Board observed he had completed 10 additional courses in emergency management (for a total of 15 such courses) and had an exceptional work record as documented in his supervisors' reports. The Board also commented that Gaul had no major disciplinary violations (as would be reflected on a form 115, "rules violation report") and had, in fact, been entirely discipline free for more than 11 years (that is, since an incident of minor inmate misconduct, reported on a form 128-A during his initial months in state prison). Reading from a recent counselor report prepared by a correctional officer, the Board noted Gaul's parole plans "are realistic and well thought out." The counselor also stated Gaul had faithfully participated in substance abuse programs (Alcoholics and Narcotics Anonymous), "anger management, life skills, religious training and study. He also has consistently participated in volunteer work to help others during his term. He has strong, close family ties as well as many friends willing to stand by him and assist him." Addressing Gaul's current attitude about the commitment offense, the Board stated, "You show remorse. You've indicated that you understand the nature and magnitude of the offense and accept responsibility for the criminal behavior in the murder of Mr. B[e]rnstein."

Governor Schwarzenegger reversed the Board's decision to release Gaul on parole, stating, "[d]espite the positive factors noted in the statement by the judge and district attorney and the strides that [Gaul] has made while in prison, I cannot overlook the gravity of this atrocious murder." The Governor also noted Gaul had made conflicting statements over the years regarding both his motivation for the murder and his level of remorse and concluded, "after carefully considering the same factors the Board is required to consider, I find the gravity of the second-degree murder committed by [Gaul] presently outweighs the positive factors tending to support his parole suitability. . . . I believe he would pose an unreasonable risk of danger to society if paroled at this time."

c. *The October 4, 2006 hearing finding Gaul suitable for parole*

An additional correctional counselor report prepared shortly before Gaul's fifth parole suitability hearing commented that Gaul "has taken the time to insightfully assess the crime he has committed, understand why he did it, and undertaken efforts to avoid similar behavior as evidenced by his faithful participation in AA/NA, self-improvement/life skills courses, religious training and study." The counselor, E.M. Wagner, concluded by urging Gaul's

release: "In joining a chorus of correctional staff, it is this writer's opinion that Gaul would be an asset to society if released at this time."

At his October 4, 2006 parole suitability hearing Gaul himself specifically addressed the Governor's observations about the inconsistencies in his statements over the years about the payment of money to him for the murder of Bernstein and his motive for participating in the killing. At one point Gaul stated, "I know that James Bernstein had nothing to do with my brother's murder or death. And I know that today. I'm very saddened for his family. I'm very saddened for my family."

The Board again granted parole. Explaining its decision, the Board reported in part: "The prisoner has no juvenile record of assaulting others, has a stable social history as exhibited by reasonable stable relationships with others. While in prison [he] has enhanced his ability to function within the law upon release [by] participation in educational programs, self-help, and therapy, vocational programs, institutional job assignments, and committed the crime as a result of significant stress in his life; particularly grief he was feeling over the recent death of his brother. . . . He has realistic parole plans which include a job offer and wonderful family support. . . . And he has maintained positive institutional behavior which indicates significant improvement in self-control." Significantly, in light of the Governor's reasons for reversing the 2005 grant of parole, the Board stated, "He does show signs of remorse. He indicated that he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior . . . ."

With respect to psychological factors pertinent to the parole determination, the Board observed the psychological report (Gaul's third and most recent psychological evaluation), prepared by Dr. Corinne Schroeder and dated June 25, 2005, "is favorable and strongly supports release" and quoted its statement that, "if [Gaul] is not ready to go home, no inmate is ready to go home." The Board also noted a May 31, 2001 psychological report (Gaul's second psychological report), prepared by Dr. Jeffrey J. Lillie, was also "favorable and appears to support release," quoting from the report that "it is unlikely that [Gaul] will engage in criminal activities to sustain himself in the future based on current risk assessment tools. The risk for future violence in the case of [Gaul] is very low."

On February 28, 2007, Governor Schwarzenegger again reversed the Board's decision to release Gaul on parole. After noting the wide variety of positive factors that would support a grant of parole, the Governor concluded

the gravity of the commitment offense, described as "especially atrocious because the offense was premeditated and was carried out in a dispassionate and calculated manner [that] demonstrated an exceptionally callous disregard for Mr. Bernstein's suffering and life," "is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk." The Governor also stated, "[a]lthough [Gaul] claims he accepts responsibility for the crime and is remorseful, he has minimized his involvement in the crime over the years."[2]

### d. *The November 8, 2007 hearing finding Gaul unsuitable for parole*

The only new evidence before the Board at Gaul's sixth parole suitability hearing was an additional correctional counselor's report recommending release and several more laudatory evaluations (or "chronos") of Gaul's activities at Avenal State Prison. The Board reviewed material regarding the commitment offense, Gaul's juvenile and adult records, Dr. Schroeder's 2005 mental health evaluation and a 1997 psychological report prepared by Dr. Michael Musacco. (Dr. Lillie's 2001 evaluation was also available to the Board.) Before reaching its decision, one of the Board members commented Gaul still had the lowest (best) possible classification score; there were in his file a number of supervisory reports that are "repeatedly, continuously all reporting exceptional with respect to your work"; and he had remained discipline free since he was involved in one minor incident in 1995. Gaul submitted detailed parole plans to the Board with contingencies for his release in either Bakersfield or Los Angeles, as well as letters from potential employers. He also provided letters from family and friends regarding the availability of housing and financial and emotional support.

Notwithstanding its two prior grants of parole and the additional information confirming Gaul's exemplary behavior in prison, the Board denied parole

---

[2] Gaul's petition for a writ of habeas corpus challenging the Governor's reversal of the parole date set by the Board as a violation of his state and federal due process rights is currently pending in this court. (*In re Gaul*, B200897.) After we issued an order to show cause in that matter, we stayed proceedings pending the Supreme Court's decision in *Lawrence, supra*, 44 Cal.4th 1181, and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573]. The instant petition, challenging the Board's November 8, 2007 denial of parole, was filed prior to the issuance of the decisions in *Lawrence* and *Shaputis*; and we have elected to consider the more recent parole denial first. In light of our decision to grant the petition, by separate order we will discharge the order to show cause in B200897 and dismiss that petition as moot once this decision is final. To the extent not included in the exhibits accompanying the instant petition, we grant Gaul's request that we take judicial notice of the exhibits filed in B200897. (See Evid. Code, §§ 452, 459.)

for one year. The Board noted Gaul had only a minor prior criminal history before the murder of Bernstein and his institutional behavior was a "most positive factor in the presentation of his suitability" for parole. Nonetheless, without any attempt to reconcile its new decision with its prior findings that Gaul was suitable for parole, the Board found Gaul would pose a danger to society if released based on the nature of the commitment offense, Gaul's unstable social history and his need for additional therapy. Specifically, the Board stated: "[I]t's important for the record to reflect that this was a case of murder for personal gain. As compared to other homicides, murder for hire negates . . . mitigation factors such as motive, state of mind, and intent. . . . It also, that is the murder for personal gain, is a contract killing and demonstrates a broken moral compass. One cannot characterize a murder for hire as simply an aberration or a situational occurrence." The Board also noted, "In the commission of a murder by strangulation, people don't die quickly. It takes a long time and a tremendous amount of force in extinguishing the life by one's hands. Throughout the entire circumstances related to the murder, there were plenty of opportunities for Mr. Gaul to cease and he failed to do so."

Going beyond the murder of Bernstein itself, the Board observed, although Gaul now spoke of his commitment to family, prior to the offense "he had an unstable social history," changing residences frequently and failing to make child support payments when due. Turning to Gaul's mental state, the Board noted Dr. Musacco's 1997 observation that "Inmate Gaul takes responsibility for his behavior. However, he tends to blame other people involved in this offense, including a woman named Mary Ellen, who he believes essentially manipulated him into believing that his victim in the instant offense may have been the perpetrator of his brother's murder. Inmate Gaul demonstrated very little empathy for his victim." Relying solely on Dr. Musacco's evaluation, without discussing either of the two more recent psychological reports prepared by Dr. Schroeder and Dr. Lillie, the Board concluded, "[T]here is minimization [by Gaul] of his involvement, and there is yet the development of sufficient insights as to the magnitude of his offense, the causation factors, also his remorse based on the absence of the development of identifying the causation factors as to why he could contract to kill someone for five thousand dollars renders his statements of remorse shallow and without impact to the decision of—without impact in this Panel finding him suitable for parole at this time. . . . [A]lthough he has made substantial gains . . . he continues to need therapy in order to face, discuss, and understand, and cope with stress in a nondestructive manner. Until progress is made, he continues to be unpredictable and a threat to others."

5. *The Petition for Writ of Habeas Corpus*

The Board's decision denying parole became final on March 7, 2008. Gaul filed a petition for writ of habeas corpus directly in this court, where his earlier petition challenging the Governor's 2007 decision reversing the Board's grant of parole was pending following our issuance of an order to show cause (see fn. 2, *ante*). After receipt of an informal response from the Attorney General, on October 16, 2008, we issued an order to show cause as to the new petition. The Attorney General's return to the order to show cause and Gaul's traverse to the return both discuss the effect of the Supreme Court's decision in *Lawrence, supra*, 44 Cal.4th 1181, on the proper scope of our review and the validity of the Board's decision denying parole.

## DISCUSSION

1. *Criteria Governing Determination of Parole Suitability*

The Board must set a release date at a parole suitability hearing unless it determines that "consideration of the public safety requires a more lengthy period of incarceration for this individual." (Pen. Code, § 3041, subd. (b).) Generally, " 'parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' " (*Lawrence, supra*, 44 Cal.4th at p. 1204, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 654.)

Under the Board's regulations it may properly deny parole to a life prisoner, regardless of the length of time served, "if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) In making its decision the Board is directed to consider "[a]ll relevant, reliable information" available to it, including "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; . . . and any other information which bears on the prisoner's suitability for release." (Cal. Code Regs., tit. 15, § 2402, subd. (b).) The pertinent regulation, which contains detailed criteria for determining whether an inmate is suitable for parole, provides the enumerated factors "are set forth as general guidelines; the

importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2402, subds. (c), (d).)[3]

## 2. *The* Rosenkrantz, Lawrence *and* Shaputis *Decisions*

In *Rosenkrantz, supra,* 29 Cal.4th 616, the California Supreme Court addressed for the first time the judicial review standard that governs a challenge to a Board decision denying parole and concluded an extremely deferential " 'some evidence' " standard applies. (*Id.* at pp. 665, 679.) "Due process of law requires that this decision [denying parole] be supported by some evidence in the record. Only a modicum of evidence is required.

---

[3] The circumstances tending to indicate unsuitability include: "(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

"(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

"(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

"(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

"(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

"(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail." (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

The circumstances tending to indicate suitability include: "(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

"(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

"(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

"(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

"(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, . . . and it appears the criminal behavior was the result of that victimization.

"(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

"(7) Age. The prisoner's present age reduces the probability of recidivism.

"(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

"(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Cal. Code Regs., tit. 15, § 2402, subd. (d).)

Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board or the Governor]. . . . It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's or] Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's or] Governor's decision." (*Id.* at pp. 676–677.)

Although *Rosenkrantz* itself considered the proper scope of judicial review of the Governor's decision to override the Board's grant of parole in a case involving a prisoner convicted of murder (see Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2), the court made clear the same deferential "some evidence" standard of review applied to decisions by both the Board and the Governor: "[W]e conclude that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658; see *In re Dannenberg* (2005) 34 Cal.4th 1061, 1084 [23 Cal.Rptr.3d 417, 104 P.3d 783].) The *Rosenkrantz* court also explained that courts were not authorized to reweigh the various factors that indicated suitability or unsuitability for parole, but only to determine whether the factors considered by the Board or the Governor in reaching a decision were actually supported by some evidence: "[T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion" of the Board and the Governor. (*Rosenkrantz*, at p. 677.)

Because of a conflict among the Courts of Appeal, the Supreme Court revisited the proper scope of the deferential *Rosenkrantz* "some evidence" standard in *Lawrence, supra*, 44 Cal.4th 1181, and *In re Shaputis, supra*, 44 Cal.4th 1241 (*Shaputis*) and clarified the role of the courts in reviewing the Board's decision: "[I]f we are to give meaning to the statute's directive that the Board *shall normally* set a parole release date [citation], a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere *acknowledgement* by the Board or the Governor that evidence favoring suitability exists. Instead, under the statute and governing regulations, the circumstances of the commitment offense (or any of the other factors related

to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public. [¶] Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence*, at p. 1212.)

Focusing on the nature of the commitment offense as a factor in the suitability determination, the court further explained, "[A]lthough the Board . . . may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.) According to the court, this standard of review, although deferential, operates to ensure the Board's decision comports with the requirements of due process. (*Id.* at pp. 1211–1212.)

The Supreme Court's majority opinions affirming this court's decision in setting aside the Governor's reversal of parole in *Lawrence* but reversing the Court of Appeal's decision in *Shaputis*, which also reversed the Governor's decision overturning the Board's grant of parole, illustrate some of the nuances of the clarified standard of judicial review. The petitioner in *Lawrence* had murdered the wife of her lover in 1971, shooting her and repeatedly stabbing her with a potato peeler. (*Lawrence, supra*, 44 Cal.4th at pp. 1192–1193.) She remained a fugitive until 1982 when she voluntarily surrendered to the police. (*Ibid.*) After a jury found her guilty of first degree murder, she was sentenced to life imprisonment with the possibility of parole. (*Id.* at pp. 1194–1195.) Early psychological evaluations stated she was narcissistic and displayed signs of various personality disorders. After 1993, however, the evaluations uniformly concluded she no longer represented a significant danger to society. (*Id.* at pp. 1194–1195.) While in prison she was

free of serious discipline, participated in a wide variety of self-help and vocational programs and earned bachelor's and master's degrees (in psychology and business administration). (*Ibid.*)

Beginning in 1994 the Board found Lawrence suitable for parole four times. On each occasion the Governor rejected the Board's decision. (*Lawrence, supra*, 44 Cal.4th at pp. 1196–1197.) The fourth rejection occurred in 2006, when the Governor found Lawrence was unsuitable for parole based on the aggravated circumstances of her crime and her early psychological evaluations. (*Id.* at pp. 1199–1200.) The Supreme Court concluded, although the crime she had committed was egregious, there was no evidence to support a determination Lawrence "*continues* to pose a threat to public safety" in view of her "extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to her criminality, her insight into her past criminal behavior, her expressions of remorse, her realistic parole plans, the support of her family, and numerous institutional reports justifying parole, as well as the favorable discretionary decisions of the Board." (*Id.* at p. 1226.) "[M]ere recitation of the circumstances of the commitment offense, absent articulation of a rational nexus between those facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Id.* at p. 1227.)

In *Shaputis*, in contrast, the Supreme Court concluded some evidence in the record supported the Governor's decision the petitioner remained dangerous and thus was unsuitable for parole. (*Shaputis, supra*, 44 Cal.4th at p. 1255.) The petitioner in *Shaputis* had a long history of domestic violence and alcohol abuse. He murdered his second wife after a night of heavy drinking and was sentenced to an indeterminate term of 15 years to life. (*Id.* at pp. 1245–1247.)

While in prison Shaputis participated in alcohol abuse programs and other forms of therapy, was discipline-free and was evaluated as presenting a low risk for violence absent a relapse into alcoholism. (*Shaputis, supra*, 44 Cal.4th at pp. 1249–1250.)[4] After the Board found him unsuitable for parole, Shaputis successfully sought relief by writ of habeas corpus in the Court of Appeal, which directed the Board to reconsider its decision. (44 Cal.4th at p. 1251.) Reconsidering its decision as directed by the court, the Board found Shaputis suitable for parole. However, the Governor reversed that determination, pointing to the circumstances of the crime and Shaputis's lack of insight

---

[4] A psychological report indicated Shaputis had a " 'schizoid quality to interpersonal relationships,' " and, if he relapsed into drinking alcohol, he would present an " 'unpredictable risk' " of future domestic violence. (*Shaputis, supra*, 44 Cal.4th at pp. 1251–1252.)

regarding it. (*Id.* at p. 1253.) Reiterating what it had held in *Lawrence*, the Supreme Court stated, "[T]he proper articulation of the standard of review is whether there exists 'some evidence' that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." (*Id.* at p. 1254.) The court affirmed the Governor's decision, concluding that the record disclosed evidence regarding both the aggravated circumstances of the commitment offense and the petitioner's "lack of insight into the murder and the abuse of his wife and family"; therefore, "some evidence" supported the determination Shaputis remained dangerous. (*Id.* at pp. 1258–1260.)

### 3. *The Board's Decision to Deny Parole Is Not Supported by Any Evidence Gaul Continues to Pose a Threat to Public Safety*

The record before the Board at the November 8, 2007 parole suitability hearing is devoid of any evidence to support the conclusion Gaul's release would constitute a current threat to public safety. As discussed, the Board in September 2005 and again in October 2006 found Gaul suitable for release on parole and concluded his release would not pose any such threat. In particular, the Board previously noted (although it failed to do so at the November 2007 hearing) that Gaul had fulfilled the terms of his plea and cooperation agreement and, as a result, the district attorney and the trial judge recommend parole for Gaul at the earliest possible time pursuant to Penal Code section 1203.01. There was no opposition from the district attorney to Gaul's release in 2007. In addition, the Board had in the past accepted as sincere Gaul's demonstration of remorse and observed, "You've indicated that you understand the nature and magnitude of the offense and accept responsibility for the criminal behavior in the murder of Mr. Bernstein. And we feel you have a desire to change towards good citizenship." None of the new material presented to the Board at the November 2007 hearing suggested any change in Gaul's perception or understanding of the commitment offense or the sincerity of his expressions of responsibility and remorse.

Gaul's criminal record prior to the murder of Bernstein was not extensive. He had had one minor juvenile matter (lighting firecrackers) for which he received counseling, and adult convictions for driving with a suspended license, driving under the influence of alcohol with an injury, and possession of a dangerous weapon. As the Board commented at all of his suitability hearings, Gaul maintained essentially a discipline-free record while in custody, having been counseled only once in 1995 for minor misconduct. While in prison Gaul obtained his GED and took college-level correspondence

courses through the University of Ohio. He also engaged in extensive vocational training, had an outstanding work history with exemplary recommendations from his supervisors and participated in an array of self-help and therapy, including Alcoholics and Narcotics Anonymous. Gaul has a strong support network with family and friends and, as described by correctional counselors and found by the Board, realistic plans for his life after release, including housing and employment.

Notwithstanding its prior determinations, however, the Board denied parole because the commitment offense was a murder for hire and was carried out in a manner that demonstrated a callous disregard for the victim's suffering; Gaul had an unstable social history before the murder; and, based on a 10-year-old psychological evaluation, Gaul continues to need therapy to understand and cope with stress, and the gains from that therapy "must be maintained over an extended period of time." Although there is some evidence to support the Board's description of the commitment offense itself, as well as Gaul's preincarceration living arrangements and failure to make child support payments, neither that evidence nor the 1997 psychological evaluation suggests Gaul currently poses a threat to public safety if released on parole or provides any evidentiary support for the Board's conclusion Gaul is not suitable for parole.

■ We do not quarrel with the Board's evaluation of the aggravated nature of the commitment offense, which appears to be the primary ground upon which it denied parole. However, as explained in *Lawrence, supra*, 44 Cal.4th at page 1214, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety." Neither Gaul's preincarceration social history nor his current mental state—the only two other factors identified by the Board—indicates in any way that Gaul remains a continuing threat to public safety.

■ First, although the record shows Gaul moved frequently during a seven month period in 1989 and was in arrears in child support, there is no evidence Gaul "has a history of unstable or tumultuous relationships with others"—the definition of "unstable social history" in the regulations governing the Board's suitability determination. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3); see *In re Burns* (2006) 136 Cal.App.4th 1318, 1328 [40 Cal.Rptr.3d 1] [unsuitability based upon history of unstable or tumultuous relationships with others and psychological evaluations].) Nor is there any

conceivable, rational relationship between the long-ago events described by the Board and an assessment of Gaul's current dangerousness, particularly in light of his productive and discipline-free years of stability while in prison. (See *Lawrence, supra,* 44 Cal.4th at pp. 1205–1206 ["a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts' "].)

Second, the Board's assessment of Gaul's mental state was irretrievably flawed by its reliance on a dated 1997 psychological report. As discussed, the two more recent (2001 and 2005) evaluations—both of which strongly supported release—had formed a key part of the Board's earlier determinations that Gaul was in fact suitable for parole. Even the 1997 report found Gaul's "behavior has been exemplary" and "his violence potential is . . . within the average to below average" range and observed he "appear[ed] to be benefitting from [his] programming." Nonetheless, in 1997 Dr. Musacco recommended that Gaul continue to participate in therapy to develop empathy and insight. And Gaul has done exactly that for more than 10 years.

Gaul has actively participated in therapy and self-help programs throughout his incarceration and, as reflected in the two subsequent mental health reports, made substantial and sustained gains. Dr. Lillie in 2001 found Gaul accepted responsibility for his actions, had achieved insight and demonstrated empathy toward his victim. Dr. Lillie concluded additional "psychotherapeutic involvement is not indicated at this time." Gaul nonetheless continued to participate in therapy and self-help programs. A correctional counselor wrote in separate evaluations prepared in 2003, 2004 and 2006 that Gaul had "taken time to insightfully assess the crimes he has committed, understand as best as possible why he did them, and undertaken efforts to avoid repeating them." This counselor opined Gaul posed a "very low risk to society" if released on parole.

In 2005, in Gaul's most recent mental health evaluation, Dr. Schroeder found, "Mental status is clear in all areas . . . ." In addition, she concluded Gaul's "risk of harm to others is below average for parolee populations, and equal to the average citizen who has never been arrested." Finally, with respect to the specific point that most troubled the Board, Dr. Schroeder wrote, "Mr. Gaul was especially candid in his description of his crime. He explained how he came to commit the crime, not in an attempt to excuse what he did, but to clarify the convoluted sequence of events and relationships between the parties involved. *There is no room for improvement in his programming, and no unmet goals to accomplish during his incarceration.*" (Italics added.)

In light of these more recent, positive psychological assessments of Gaul, previously accepted as valid by the Board, the findings that even more therapy is needed or that therapeutic gains need to be maintained for additional time—and the Board's concomitant conclusion that Gaul is not now suitable for parole—lack any evidentiary support. As the Supreme Court explained in markedly similar circumstances in *Lawrence, supra*, 44 Cal.4th at pages 1223 through 1224: "[T]he positive psychological assessments of petitioner in every evaluation conducted during the last 15 years have undermined the evidentiary value of these dated reports setting forth stale psychological assessments. Moreover, in the negative psychological assessments cited by the Governor, the treating psychologists recommended petitioner should undergo specific forms of therapy—which she did for many years, resulting in successive positive evaluations. . . . [T]he passage of time is highly probative to the determination before us, and reliance upon outdated psychological reports—clearly contradicted by petitioner's successful participation in years of intensive therapy, a long series of reports declaring petitioner to be free of psychological problems and no longer a threat to public safety, and petitioner's own insight into her participation in this crime—does not supply some evidence justifying the Governor's conclusion that petitioner continues to pose a threat to public safety."

In sum, notwithstanding the nature of the commitment offense itself, there is no evidence to support the Board's determination Gaul currently poses an unreasonable risk of danger to society if released on parole.

### 4. *The Appropriate Relief upon Granting the Writ Petition*

The Supreme Court in *Rosenkrantz, supra*, 29 Cal.4th at page 658, stated, "If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." However, as discussed, in *Lawrence* the court instructed the reviewing court not to examine simply whether some evidence supports the existence of certain factors related to unsuitability but, considering the entire record presented at the parole suitability hearing, "whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1212.) Having concluded that no such evidence exists in "the full record before the Board" (*id.* at p. 1221), vacating the denial of parole and directing the Board to conduct a new hearing on the same record would be a meaningless exercise—particularly in this case in which the Board had previously twice determined Gaul's release would not pose an unreasonable risk of danger to society and the only new evidence

presented at the November 2007 parole hearing supported his suitability for release on parole. (Cf. *In re Smith* (2003) 109 Cal.App.4th 489, 507 [134 Cal.Rptr.2d 781] [affirming order granting petition for writ of habeas corpus and declining to remand to Governor, which "would amount to an idle act"]; *In re Gray* (2007) 151 Cal.App.4th 379, 411 [59 Cal.Rptr.3d 724] [same]; see generally *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 118 [50 Cal.Rptr.3d 208] ["law does not require a futile act"]; Civ. Code, § 3532 ["law neither does nor requires idle acts"].)

Indeed, after granting Sandra Lawrence's petition for writ of habeas corpus, this court ordered that "she be released forthwith," notwithstanding the Attorney General's argument the matter should be returned to the Governor to permit him to determine whether some other basis existed for denying Lawrence parole. The Supreme Court affirmed "the judgment of the Court of Appeal." (*Lawrence, supra*, 44 Cal.4th at p. 1229.) Although *Lawrence* involved the denial of parole by the Governor, not the Board itself, we understand the Supreme Court's affirmance of our judgment to mean that when the reviewing court has determined there is no evidence in the record that would support the denial of parole, there is no reason to order the Board to conduct any further hearing on the matter, at least in the absence of some new evidence about the inmate's posthearing conduct. (See *In re Singler* (2008) 169 Cal.App.4th 1227, 1245 [directing Board to hold new hearing and to find Singler suitable for parole "unless *new evidence* of his conduct and/or change in mental state *subsequent to the 2006 parole hearing* is introduced and is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole"]; see also *In re Burdan* (2008) 169 Cal.App.4th 18, 39 [86 Cal.Rptr.3d 549] [when it is determined there is not "some evidence" in the record to support the denial of parole, "to 'proceed in accordance with due process of law' does not mean the Board, or the Governor, is to be given an opportunity to reconsider the parole decision"].)

We do acknowledge the theoretical possibility—however unlikely it may be—that Gaul has engaged in conduct since the November 2007 parole hearing that would suggest he is no longer suitable for parole. Accordingly, rather than simply order Gaul released forthwith, as we did in *Lawrence*, we direct the Board to find Gaul suitable for parole unless, within 30 days of the finality of this decision, the Board holds a hearing and determines that new evidence of Gaul's conduct in prison subsequent to his 2007 parole hearing supports a determination he currently poses an unreasonable risk of a danger to society if released on parole.

## DISPOSITION

The petition for writ of habeas corpus is granted. The Board is directed to find Gaul suitable for parole unless, within 30 days of the finality of this decision, the Board holds a hearing and determines that new evidence of Gaul's conduct in prison subsequent to his 2007 parole hearing supports a determination he currently poses an unreasonable risk of a danger to society if released on parole. In the interests of justice and to prevent frustration of the relief granted, this decision shall be final as to this court five days after it is filed. (Cal. Rules of Court, rule 8.387(b)(3)(A); *In re Aguilar* (2008) 168 Cal.App.4th 1479, 1492 [86 Cal.Rptr.3d 498].)

Woods, J., and Jackson, J., concurred.