[No. A125665. First Dist., Div. Two. Mar. 16, 2010.]

In re ERNESTO RANGEL JUAREZ on Habeas Corpus.

## Counsel

John P. McCurley, under appointment by the Court of Appeal, for Petitioner Ernesto Rangel Juarez.

Edmund G. Brown, Jr., Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Amanda J. Murray, Deputy Attorneys General, for Respondent State of California.

## Opinion

**LAMBDEN, J.**—Petitioner Ernesto Rangel Juarez petitions this court for a writ of habeas corpus releasing him from prison after the Board of Parole Hearings (Board) denied him parole and the San Mateo County Superior Court denied a previous writ petition. There is no evidence in the record to support the Board's denial, or that Juarez continues to pose an unreasonable

risk of danger to society. Therefore, in accordance with *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*), we grant his petition.

Juarez, presently 50 years old, was convicted in 1982 of the second degree murder of Bruce Farley, who was killed in a vehicle collision Juarez caused when, impaired by PCP and other substances, he lost control of his car as he raced away from police. Juarez was a repeat substance abuser who had been in previous collisions, and had been warned of the hazards of driving under the influence. The Board granted him parole in 2004, only to be reversed by the Governor. As of his July 2008 Board hearing, Juarez had for some time fully accepted responsibility for the commitment offense and for knowingly driving while high on PCP, had not disputed any of the facts of his crime, and had expressed remorse for killing Farley. He had been a model prisoner for years, was an ongoing participant in Alcoholics Anonymous (AA) and a past participant in Narcotics Anonymous (NA), acknowledged that he was an alcoholic and a drug addict, and pledged to continue his participation in AA after his release with the help of his family and an arranged sponsor. He had been a highly respected worker in the prison's optical lab for at least a decade, become a licensed optician, and successfully taught other prisoners seeking to become licensed themselves. He had a supportive family and realistic parole plans, and multiple job offers as well. His 2004, 2007, and 2008 psychological evaluations each concluded that he posed a low risk for violence if released and was suitable for parole.

Nonetheless, the Board denied Juarez parole in July 2008, based on three reasons. The Board relied significantly on its "questions" regarding Juarez's "credibility" because of his claims that he blacked out while driving at the time of the commitment offense, and could not recall his criminal acts in a 1981 incident while drunk. The Board's reliance on these questions makes no sense in view of its simultaneous rejection of Juarez's attorney's requests that it further investigate Juarez's blackout claims, finding that these claims were not dispositive of anything and that their merits could not be determined. The Board also relied on what it considered to be the heinous nature of his commitment offense and, finally, on his violent criminal history, based on a rote recitation of unsuitability factors that were neither supported by evidence in the record nor probative of Juarez's present dangerousness.

The Board abused its discretion and denied Juarez his due process rights by its reliance on these three reasons. We conclude, as did Justice Scotland, writing for the majority in *In re Palermo* (2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101] (*Palermo*) under similar circumstances, that, "in light of the nature of defendant's crime, the period of time that has elapsed since the crime, the affirmative evidence of his preconviction and postconviction

conduct and his current mental state shown by his rehabilitative efforts and psychological evaluations, and his future prospects if granted parole, there is no evidence to support the Board's finding that he poses a danger to public safety if released on parole." (*Id.* at p. 1112.)

## BACKGROUND

### *Juarez's Second Degree Murder Conviction*

We summarize the facts of Juarez's commitment offense and the relevant trial testimony from an undated probation department report prepared around the time of his sentencing in 1982. On the afternoon of March 6, 1982, Juarez, then 22 years old, and three male friends were parked outside a fast-food restaurant in South San Francisco, California, talking to a group of girls, who then went around the corner. Moments later, one of the girls saw Juarez drive his car onto a street that approached El Camino Real, strike a car at the intersection, continue down the street and strike another car, then turn left and flee at a high rate of speed down El Camino Real. A South San Francisco police officer in a patrol car soon pursued Juarez as Juarez sped down the street in excess of 65 miles per hour. When the officer turned on his lights and siren, Juarez "punched" his accelerator and increased his speed greatly. Unable to negotiate a curve in the road, Juarez went across the double yellow lines into the oncoming lanes, where he struck a vehicle, killing Bruce Farley instantly. Juarez's vehicle careened off of Farley's and came to rest 300 feet away.

The officer found four people in Juarez's car, including Juarez, conscious and complaining of minor injuries. Juarez was taken to the hospital. The paramedics and the emergency room doctor testified at trial that he was alert and oriented, but suspected that Juarez had either hit his head or was under the influence of some kind of drug. A blood sample taken from Juarez was found to have a level of 30 nanograms of PCP.

Juarez testified at his trial that he began using PCP in January 1978. He said that he obtained the PCP from " 'friends in the park,' " that it was always in a marijuana "joint," and that he could not tell the difference between PCP and marijuana. However, he admitted buying PCP at a price of $20 per joint, rather than the $5 he paid for five or six marijuana joints. He claimed to have knowingly used PCP eight to nine times and that his probation officer had only told him about two positive urine tests.

Juarez also testified that he left his house on March 6, 1982, to have his car washed, and ran into a high school friend who was accompanied by two others. The four rode to a South San Francisco fast-food restaurant. His three

companions were drinking beer and smoking joints, but Juarez did not have any. He said that he finally succumbed and took "one or two hits" from a joint, "then blacked out and remember[ed] nothing else until being pinned in his car after the accident that killed Bruce Farley." He acknowledged that his driver's license was suspended at the time of the crash, and that he had told a similar " 'blackout' " story concerning his involvement in a previous accident.

At Juarez's trial, both sides presented expert witnesses to testify about the circumstances of the crash. The speed limit in the area was 35 miles per hour. The defense expert estimated that Juarez's car was traveling at a speed of 62 to 68 miles per hour, while the People's expert testified that Juarez was traveling at a speed between 68 and 76 miles per hour.

Both sides also presented expert witnesses to testify about the role of Juarez's PCP use in the incident. The People's expert testified that at a level of 30 nanograms of PCP, a person would definitely be under the influence of the drug and impaired in the functions normally associated with driving an automobile. However, PCP does not cause a person to lose control, "and a person is able to act rationally and within the bounds that the law imposes on a person even though he is intoxicated on PCP." The expert also testified that Juarez's story that he did not know that he was using PCP was unlikely.

The defense expert testified that PCP is a drug with unpredictable qualities, that it commonly causes amnesia, and that people "sometimes go from conscious to unconscious on very low levels." He also said that PCP interferes with the abstract thinking process carried on in the brain.

The People also called Juarez's probation officer, who testified that Juarez was subject to chemical testing from January 1980 through February 1981, had tested positive for PCP four times, and had been told about the hazards of driving under the influence of PCP.

The 1982 probation department report includes the following statement from Juarez (presented here with the spelling and grammatical errors contained in the record) to the probation department: "Well I left my house on Saturday March 6, [1]982 to go wash my car I went to [C]olma and wash my car their on the way home. I seen a friend near my house so I stop to talk to him for a while and he was walking to the store so I give him a ride up the street when we seen a friend of mine I haven't see since Junior high so we talked for awhile and Jessie and his friend got in the car and we went for a ride to grand auto in S.S.F. oh they were drinking beer but I wasn't. and we were parked in front of fish and chips I went to the store to price a few things and came back and we were just sitting there and someone lite some

marijuana and they past it around Im not sure how had it. just that they were passing it around and they offered me some at first and I didn't want any and then I finially took a few hits of the marijuana and after about three hits I dont remember what happen to me. just from what I was told what had happen to me and I couldnt believed it cause I couldnt remember anything. But like walking up and seeing the front window smashed and seeing the mountain on my left and I couldnt move. and then going somewhere in a ambulance. thats all I can remember what happen to me. and I didnt do this on purpose."

Juarez also stated in his 1982 probation department interview that, while he knowingly took a marijuana cigarette from his companions on the day of the incident, he did not know that it contained PCP. He immediately went into a blackout and did not remember what happened until he woke up after the collision.

The jury found Juarez guilty of second degree murder, as well as negligent vehicular manslaughter, felony drunk driving, and two counts of misdemeanor hit and run. The court sentenced Juarez to 15 years to life for the second degree murder conviction, and stayed the remainder of the sentences.

### *Juarez's Prior History*

According to the 1982 probation report, Juarez was born in San Francisco in 1959, had lived most of his life with his family, and was residing in Daly City at the time of the commitment offense. His father died in 1978 from cancer. Juarez was a poor student who had dropped out before graduating from high school. He said his occupation was warehouseman and that he was a union member, had held some jobs and received a good work review, but could not find steady employment.

Juarez reported that he used marijuana and on occasions had used PCP. He denied using heroin or cocaine. His probation was revoked in March 1981 because he tested positive for use of PCP.

The 1982 probation department report indicated that Juarez had no juvenile record, but had been convicted of numerous misdemeanors as an adult. In October 1977, he was convicted for drunk driving and resisting arrest. In December 1977, he was convicted of assault and battery for slapping the face of a woman, apparently his girlfriend at the time, and punching her in the stomach. In October 1978, he was convicted of hit and run, after he was observed driving at a high speed, losing control of his car, hitting a no parking sign, and leaving the scene. In 1979, he was convicted of public drunkenness and resisting arrest, and was found to be wearing a holster that

matched a revolver found in the trunk of a stolen vehicle. In December 1979, he was convicted of felony auto theft that was reduced to misdemeanor joyriding.

Juarez's most serious prior misdemeanor conviction was in 1981, for reckless driving. A 1981 probation department report from that case stated that, according to one of his friends, Juarez " 'flipped out' " and started doing "crazy things such as rolling down the windows and driving erratically." The friend got out of the car and Juarez fired three gunshots at him, but missed. Juarez drove away and collided with a car while traveling at a speed of about 90 miles per hour, causing the car to crash into a center divider, but Juarez did not stop or slow down. He hit a second car traveling at an estimated 80 to 100 miles an hour, and continued on, hitting a third and then a fourth car, leading to significant injuries to the two people in the fourth car. Juarez lost control of his car, crashed, and fled on foot. A pistol was found in his car. According to the probation department report, he did not express any remorse for his actions, claimed to have suffered a " 'blackout,' " would not discuss the actual incident, said he had no history of blackouts, did not want medical help for his " 'condition,' " and said that he did not use any dangerous or illegal drugs and used alcohol on weekends only.

### Juarez's Postconviction History in Prison

As of the July 29, 2008 Board hearing, Juarez had been incarcerated for approximately 26 years. In 2004, the parole board granted Juarez parole, but Governor Schwarzenegger reversed that decision.

According to a 2008 life evaluation report, Juarez has not been subject to any disciplinary actions since 1993. He was subject to eight disciplinary actions between 1983 and 1993, five being rules violation reports and three being custody counseling chronos. These were for refusing to work (1983), tattoo paraphernalia (1983), being absent from class (1984 & 1985), delaying the close custody count (1985), inciting to assault staff (1986), destruction of state property (1987), and drug paraphernalia (1993).

The 2008 life evaluation report also indicates that Juarez participated in a number of therapy and self-help activities. He was continuing his participation in AA, and had participated in NA in the past. He completed the "Breaking Barriers" program in 1991, a five-week course in relationships in 2005, workshops in men's violence prevention in 1996, anger management in 2003, stress management in 2004, and participated in a prisoner's outreach program in 2005. He completed an anger management program in 2005, was given a certificate of appreciation by the Boy Scouts of America in 2007, a certificate of excellence for participation in the prison outreach program in

2006, and a certificate of appreciation for his facilitation of "Tawheed, Changing Faces," in 2006. The report states that his "overall pattern of behavior is very good." The record contains chronos indicating continuous participation in AA from the last quarter of 2003 through the first quarter of 2008, and continuous participation from July 1998 through 1999, and from January through March 1998; chronos also indicate participation in NA for six months in 2006, three months in 2005, and from July 1998 through March 1999.

Juarez's most significant work achievements have been in optical training, including his designation as a certified optician by the American Board of Opticianry in 2004. At the time of the 2008 hearing, he was continuing his assignment to the lens lab in the prison, where he had worked for 10 years, and had "very good" relationships with staff. His work and teaching skills were noteworthy. A vocational instructor at the optical lab who had worked with Juarez since 1998 wrote: "His skill, workmanship and teaching ability would be extremely valuable to potential employers. The November 2008 American Board of Optician exam resulted in 24 of 25 inmates passing to become certified opticians. This is a (96%) success rate. Juarez provided lessons to help these inmates achieve this nationally recognized professional certification. He has been dedicated to education and helping other inmates with the educational goals as long as I have known him. Juarez has passed the American Board of Opticianry Contact Lens and Spectacle Lens exams. Juarez is very suitable for employment as an Optical Technician, Dispensing Optician or teaching Optics."

The record also contains numerous certificates indicating Juarez's participation in various work and study programs, including vocational training for small engine repair, food protection, customer service, and welding.

### *2008 Psychiatric Evaluation*

In 2004 and 2007, Dr. John T. Rouse, a forensic psychologist, conducted psychological evaluations of Juarez and concluded that he was a low risk for violence if released and was suitable for parole.

Juarez's most recent evaluation was conducted on June 30, 2008, by Dr. Sara Bowerman, a forensic psychologist. Bowerman reported that Juarez "exhibited fairly good insight into the factors involved in his instant offense. When asked what had contributed to his behavior, Juarez responded: 'Stupidness, not taking responsibility, I was just a stupid kid. I didn't think I was going to kill someone.' He acknowledged the impact of his drug use, irresponsibility of driving while under the influence, and an overall level of irresponsibility and immaturity. [¶] Juarez expressed feelings of guilt and

remorse for his crime and when asked how he feels about what happened to his victim, he responded: 'I'm very sorry that I took his life, he was still a young man at the age of 31, never got to marry or have kids. I robbed his mother of grandchildren.' He acknowledged that he was 'out of control.' Juarez accepted his sentence of 15 years for second degree murder. He acknowledged and accepted responsibility for his actions in the instant offense. When asked who's to blame for your crime, he responded: 'I am. I'm to blame for everything I've done.' "

Bowerman's diagnostic impressions included that Juarez "openly acknowledges a persistent use/abuse of alcohol and drugs (marijuana and PCP)." She found no symptoms of any thought or mood disorders, indicated that he "has reportedly gotten along well with peers and staff and has achieved a high level of functioning and impulse control since his incarceration," and stated that he appeared to "evidence remorse and sadness regarding his crime resulting in the death of the victim."

Bowerman reported that, applying the "Hare Psychopathy Checklist-Revised," which gives a measure of psychopathy, a moderate predictor of future violence, Juarez "produced a score that placed him in the very low range of psychopathy when compared to other North American male offenders in the normative sample," scoring better than 96 percent of those offenders, based on his lifetime history. Similarly, his results pursuant to another assessment evaluation, HCR-20, indicated "minimal concerns for future risk of dangerous behavior."

Juarez told Bowerman that he had begun drinking alcohol at age 14 or 15 on weekends, had begun smoking marijuana on a daily basis in high school, and "had previously smoked PCP on only a few occasions prior to the instant offense although the reports regarding this are inconsistent throughout his record. Juarez acknowledged that he was under the influence of alcohol, marijuana, and PCP at the time of his crime and this played a significant role in his judgment, decision making, and emotional/mental status at the time of the offense. A potential future risk . . . would be substance abuse relapse which would pose a risk for future violence or choices such as the current charge. His continued involvement in 12 step programs (i.e., NA) is very important both prior to and following his release."

Bowerman continued, "It is a protective factor that the inmate has been reportedly abstinent for 15 years and that he expresses a strong desire to continue to abstain from substance abuse in the future. His continued involvement in NA and stated intention to work with an outside sponsor are further important protective factors against possible future relapse. Juarez states that he intends to continue his NA involvement following his parole,

which is extremely important to his continuing success and personal growth in this area. He evidenced a positive level of insight and self-awareness into the impact of his drug use onto his mental and emotional functioning at the time of his life crime."[1]

Bowerman also opined that Juarez "has explored the factors involved in his life crime fairly well. Juarez has addressed and explored his commitment offense both within his self-help programs and by involving himself in some offered mental health classes and services even though he is a GP inmate and is generally precluded from these services. He expresses remorse for the impact of his crime on both his own and the victim's family. He takes full responsibility for his actions and evidences awareness of the impact of substance abuse as a significant factor in his crimes."

Bowerman's overall risk assessment was that Juarez "poses a **low** likelihood to recidivate in a violent manner if released." "This risk level primarily stems from [Juarez's] involvement in self-help work, good level of insight, and positive family support. He has developed vocational and housing plans to maintain his support and stability in the community as a part of his parole plan. [¶] [Juarez] has shown a good level of stable functioning during his incarceration, does not evidence a predatory personality, and expresses a desire to lead a sober lifestyle free of any further legal interactions. He has actively participated in self-improvement to establish and maintain a lower risk level."

### The July 2008 Parole Board Hearing

At the beginning of the July 29, 2008 Board hearing, Juarez was asked about a portion of the statement attributed to him in the 2008 life report, which included the statement that, after at first refusing, " 'I finally took a few hits from the marijuana. After these hits, I don't remember what happened to me, but waking up and seeing the front window smashed and seeing the mountain on my left. I could not move and then going somewhere in an ambulance. That is all I could remember and I did not do this on purpose.' "

Juarez replied that some of the statement was taken "from year after year," and that it did not still represent his position about his commitment offense. Among other things, he stated that his driver's license had been suspended, that he should not have been driving, and that he did not have car insurance at the time. He said that he parked with his companions in front of a Grand

---

[1] Bowerman stated that Juarez was continuing participation in NA, but Juarez told the Board he had told her he was continuing participation in AA.

Auto in South San Francisco and he went in to price a part for his car, but was told he had to go to a dealer for the part. His friends "were opening beers . . . . I took a sip, and then one guy lit up a marijuana cigarette and he was passing it around. I took a hit. After I hit, I smelled and then I tasted it. It was PCP." He had experience with PCP, and knew what it felt like to ingest it. He had experienced one blackout previously. He needed to go home, and thought he could still drive because he did not feel the full effects of the drug before doing so, although he previously had been counseled about the dangers of drinking and driving by a probation officer. He had no reason for ignoring the advice, other than that he did not think anything like the accident was going to happen. He remembered "starting the car and driving about a block, and then from there, I don't remember from there, except for like waking up behind the car, behind the steering wheel."

At this point, Juarez's attorney began an extended discussion with the Board and opposing counsel about Juarez's blackout claim. Juarez's attorney first requested that, if the issue of the blackout was going to be of concern to the Board, as it had been to the last Board, medical reports from the time of the incident be subpoenaed, if possible, to see if they supported "the blackout scenario."

The commissioners responded by noting references to the medical evidence already contained in the record. Among other things, the presiding commissioner referred to the summaries of, and differences between, the prosecution and defense expert testimony at Juarez's trial that we have already discussed herein. She opined that further investigation, rather than clarifying the issues, could "just get into the quagmire . . . of one expert talking about the possibilities versus the other," and stated that the prosecution expert's testimony and Juarez's admission that he recognized the effects of PCP when he smoked the marijuana cigarette were "very important to the panel." She then asked Juarez how many times he had used PCP prior to the commitment offense, and Juarez said "about five" to his knowledge, in marijuana cigarettes.

Juarez's attorney would not drop the subject, however, arguing that a medical report could show not only the effects of drug ingestion, but also that Juarez struck his head, which would bolster his blackout claim. The presiding commissioner responded, "That's true. But again, we're left with speculation in the end. I don't see how there's going to be any dispositive finding."

The presiding commissioner asked the deputy district attorney present at the hearing if the 1982 records would still be available, and the attorney indicated it was possible. The deputy district attorney added that there was also the "significant" issue of "credibility" because, while Juarez had indicated at his trial and in numerous prior Board hearings that he had no

memory of what happened, at his 2003 Board hearing, "he stated that he remembered 'most of the commitment offense' . . . clearly reciting facts that are integral parts of the operative facts of the event."

The panel immediately recessed and reviewed several prior hearing transcripts, including the transcript of the 2003 hearing. Back on the record, the commissioner quoted to Juarez from the 2003 hearing transcript: "[L]et me quote the Commissioner [in 2003]. He says 'Okay, regarding the crime, apparently, the inmate had been involved in some traffic accidents in March of 1982. Someone called the police, then a police unit spotted him and they went in pursuit of his vehicle, and he was doing in excess of 65 miles an hour when he crossed over the double white line, struck the victim, Bruce Farley, in his vehicle, killing him. Juarez, are you responsible for the death of this victim?' Inmate Juarez, 'Yes, I am.' Presiding Commissioner Risen, 'Now, do you remember anything about the commitment offense?' Inmate Juarez, 'Most of it.' Presiding Commissioner Risen, 'You do. Okay. How much had you had to drink on that day?' Inmate Juarez, 'I think I only had a couple sips of beer.' . . . Risen, 'Had you taken any drugs?' Juarez, 'Yeah, it was marijuana. It was laced with PCP.' Risen, 'Why was it when the police put on their red lights and sirens, you did not stop?' Juarez, 'I didn't know they were behind me.' Risen, 'you did not hear the siren?' Juarez, 'No.' Risen, 'The information here is you increased your vehicle speed when they turned on the red lights and siren. Do you remember speeding up?' Juarez, 'Inaudible,' meaning that the transcriptionist didn't hear whatever you said."

The presiding commissioner than asked Juarez a question that the Board had "interim to commenting on the request for some sort of investigation," which was "why is it that in that year . . . you said you did remember what happened with the crime?" Juarez responded, "I said most of it from the beginning up to the part I ingested, and that's what I'm probably referring to, the most of it, not—I don't remember the officers behind me. I don't remember speeding up. I was asked why didn't I stop. I probably said probably didn't hear them. I was incoherent from the drugs." The presiding commissioner responded that "[a]ctually, most of the crime occurred during the time period which you claim not to remember, and there was a lot that went on and you did a lot during that period of time." However, she also stated that it was "unclear" that an investigation into the medical records "would be a productive request" because it would not give the panel any more information relevant to Juarez's memory of the crime. She explained, "If you don't have memory of the crime, it could have been the drugs; it could have been impact and trauma, physical trauma. So there's really—it's not clear that there would be any way, especially at this date and time, to ascertain that. So the panel feels, it's just important to proceed at this time."

Juarez was then asked if he was "claiming here again today that you have never had any memory of the commitment offense beyond the point at which you took a hit from the marijuana cigarette?" Juarez responded, "Yes. It's just driving one block after that. They said I hit a couple of cars. I don't remember hitting those cars either."

Juarez's counsel, however, continued to implore the Board to further investigate the blackout issue. He referred to the possibility of the Governor reviewing the matter again, and repeated his concern that if the blackout was going to be an issue, "there has to be something that resolves that one way or the other." Once more, the presiding commissioner resisted further investigation. She said that the Governor did not appear to be concerned previously with the blackout issue, that "what was at issue was the malice and callous and conscious disregard for the lives of countless others by driving under the influence of PCP," and that "prior to the crime, one could argue that [Juarez] knew what he was doing." She again stated that the record reflected the views of the medical experts who testified at trial, and that "it's not clear that any amount of investigation is ever going to be determined" with regard to Juarez's claim of memory loss.

The presiding commissioner then invited comment from the deputy district attorney, who argued that the Governor was not concerned with Juarez's memory, and again argued that Juarez's "credibility" was an important issue: "[O]nly Juarez can tell us what he remembers and what he's willing to tell us he remembers, and that has bearing on his insight. If this panel believes that he remembers nothing, this panel still has the ability to assess his insight into his crime because the crime occurred at the point that he ingested the PCP with knowledge of what its potential consequences were and with the driving history that he had and then got behind the wheel and drove. Whether he hit one car or three cars before he killed Mr. Farley, whether he was going 55 or 85, or whether he remembers any of that is not, I don't think, dispositive of anything. I think the real is—one of the issues is his credibility, his willingness and his insight into simply talking about what happened. So I don't see where an exam would take us."

Juarez's attorney responded that whether Juarez was driving to evade the police or because he was "on automatic pilot" mattered regarding his parole suitability. The presiding commissioner disagreed, saying, "Not necessarily. If he knew when he took that hit that he was placing himself in harm's way, in jeopardy, and placing others who were under his care in harm's way, which he was, then I don't see there is anything so different about those two."

The commissioners discussed the Governor's previous concern and Juarez's account of what he could remember, at which point Juarez's attorney stated,

"It seems to me the Governor's point is that—because it's in quotes, if [Juarez] doesn't remember it, how did he take full responsibility for it?" The presiding commissioner agreed that this was "a logical question," and asked Juarez how he would answer it. Juarez responded: "I take full responsibility for the crime because I know I was driving; I know I shouldn't have been that day simply because I didn't have a driver's license. But I know I committed the crime. There wasn't anybody else in the car driving but me, and I'm responsible for that death of Mr. Farley."

Juarez also took responsibility "[f]or the other vehicles that I hit. I don't know if anyone was injured in there. Probably for everything I've done in the past I'm responsible for." He said he was responsible for the police pursuit, which he did not dispute despite his lack of memory, and said that he was "responsible for that whole day's occurrence." Upon further questioning, Juarez denied having any blackouts, or taking any PCP or marijuana, after this time. When asked if he had any drug-related offenses in prison, he acknowledged the 1993 drug paraphernalia offense, but denied that he was actually involved. The presiding commissioner then stated that the Board had decided to continue with the hearing, and to "overrule your request to do an investigation in this matter at this time."

The Board also asked Juarez about other factual claims in the Governor's prior denial letter regarding his misconduct between the ages of 18 and 22, which he acknowledged were true. The Board then asked him about his earlier driving incident in 1981, when he tried to run down a friend, fired shots at him, and drove recklessly on the highway, hitting four cars. Juarez acknowledged that he did not remember what happened, stating, "I was drunk." The presiding commissioner responded that being drunk did not "necessarily equate to not remembering," and asked, "Why do you think that you don't remember?" to which Juarez responded, "I don't know." Upon further questioning, he stated, "My only conclusion was I was in a blackout. I was at a party. I left. I felt myself becoming intoxicated. I didn't want to stay that long, and I just—I wanted to go home." He further stated, "the alcohol impaired my thinking, my judgment, and I shouldn't have drove, but I did."

The presiding commissioner turned to the Governor's expressed concern in his previous denial letter that at the 2004 Board hearing, when the Board failed to mention Juarez's prior reckless driving conviction, Juarez, when asked if anything had been missed regarding his criminal history, responded, "None that I can recall." The presiding commissioner, noting that the Governor viewed this as a failure by Juarez to take ownership of his prior misconduct, asked Juarez why he had not referred to his prior criminal history. Juarez responded: "I didn't know all that occurred that day as I explained last year. That was the first time I had heard that in details about

what occurred with my friend because it was my friend, about they said I tried to run him over. I remember going to court for shooting a gun in city limits and I wasn't going to court for anything other than the other—except for the reckless driving, but nothing was ever said about what happened there. That's why I didn't know about that. I wasn't trying to not bring it up." He repeated that he did not remember shooting at his friend or trying to run him over.

The presiding commissioner asked Juarez to state what he understood was the issue before the Board regarding his prior hearing testimony. Juarez responded that it was "[o]f prior using alcohol, drugs, driving when I'm not supposed to, getting into accidents, and this. It's a big concern it's just going to be a reoccurrence when I get out. I understand that." The presiding commissioner added that there was a collateral issue that "you have incidents that you say you don't remember, but they're not—they don't involve a potential concussion and they're not—they don't involve PCP. We're talking about alcohol." Juarez acknowledged in response to questioning that he considered himself to be both an alcoholic and a drug addict. Later, when asked what "conclusions" he had come to about his "mindset" when he committed his crimes, and how he had changed, Juarez stated: "At the time, just being, how can I say it, loaded, stoned all the time, I think it really impaired my thinking at the time. And drinking almost every weekend . . . . When I became an adult, I just—I drank. Today, I don't need it anymore. I know it destroyed my life and I took an innocent life also. I destroyed a lot of people. Probably with my erratic driving, the other people probably were really scared, but today I know I don't need alcohol or drugs anymore. I'm afraid of it. I'm afraid to become that person again."

Juarez testified about his various prison activities, which we have already summarized. He also said that he was continuing to regularly participate in AA, regularly attended church, was participating in additional programs as well, and had an AA sponsor waiting for him if he was released. He stated that he had secured two job offers, and hoped to find work in the optics field. Three different family members had offered him a place to live upon his release. His mother had written to the Board that the family had information regarding AA meetings, times and locations, that she would be able to take him to the meetings, and that they would obtain medical insurance for him and provide him with financial support until he could support himself. His sister and niece wrote similarly supportive letters to the Board.

After closing arguments, Juarez also stated: "I know I'm going to continue to go to AA. It's a way of help. This I understand and I know this, and it's just got to be a way of life with me. I can't live without and I know that if I don't, I know I can end up down there or anything could happen possible."

### *The Board's Denial of Parole*

After a 30-minute recess, the Board reconvened and the presiding commissioner stated its decision to deny parole to Juarez for another year. First, the Board found that the commitment offense "was carried out in an especially heinous, cruel and callous manner." The presiding commissioner stated in support of this finding that Juarez knowingly smoked PCP and drove his vehicle, rendering it a deadly weapon, hit cars, "attacked or killed" multiple victims, evaded the police by increasing his speed, and killed Farley, whose body "was mutilated," although Juarez was found to be conscious, alert and oriented after the incident, and had been on probation and tested positive for PCP four times prior to the incident. Also, his offense "was carried out in a manner demonstrating exceptionally callous disregard for human suffering. The first two victims were undoubtedly traumatized from the collisions, and Farley was particularly vulnerable as he had no way of avoiding your on-rushing vehicle. Public safety clearly was at risk." Finally, the presiding commissioner stated that the motive for the crime was "inexplicable to this day," and that Juarez could not recall "earlier that day" trying to run down his friend and firing shots at him. Although the presiding commissioner acknowledged that Juarez had taken responsibility for this, he had no memory of these events, causing the Board to find, as the commissioner told Juarez, "your credibility is at stake here, sir, and it continues to be in question."[2]

Second, the Board found that Juarez had "a history of violence and assaults and prior criminality that do show an escalating pattern of criminal conduct," referring to his criminal history before the commitment offense.

At the conclusion of the hearing, after referring to several suitability factors, the presiding commissioner emphasized the Board's concern about Juarez's "credibility," suggesting by her comments that it was an independent basis for its decision. She said that the Board could not "solve this . . . apparent dilemma," would request a new psychological evaluation addressing his claims to not remember his crimes, and instructed Juarez to "take the initiative" to "resolve this situation."

---

[2] The presiding commissioner's analysis closely followed, without referring to, the parole unsuitability factors contained in California Code of Regulations, title 15, section 2402, subdivision (c)(1), which are that "(A) Multiple victims were attacked, injured, or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

### *Juarez's Petition to the Superior Court*

In April 2009, Juarez filed a petition for writ of habeas corpus with the San Mateo County Superior Court. The court denied the petition because it found the Board's findings as to the nature of the commitment offense and the motive for the crime (or lack of evidence thereof), combined with evidence of Juarez's escalating pattern of criminality prior to the commitment offense, to be probative of his current dangerousness under *Lawrence, supra*, 44 Cal.4th 1181, and that his lack of memory created a "credibility" issue that was "certainly probative of current dangerousness." Juarez filed a petition for writ of habeas corpus with this court on August 4, 2009, which was informally opposed by the Attorney General. We subsequently issued an order to show cause. The Attorney General filed a return to our order, followed by Juarez's filing of a traverse, each accompanied by exhibits that we refer to herein.

## DISCUSSION

Juarez argues that the Board's denial of parole violated his due process rights pursuant to *Lawrence, supra*, 44 Cal.4th 1181, because the Board did not establish a rational nexus between its three reasons for denial and Juarez's current dangerousness, and because there is not "some evidence" of such dangerousness. Juarez further argues that the Board engaged in "rote recitation" of certain factors without giving individualized consideration to the circumstances of this particular case, made factual findings of unsuitability that were unsupported by the record, and did not consider all of the required suitability factors. Juarez seeks immediate release, rather than remand to the Board for another hearing to determine his parole suitability. We agree for the most part with Juarez's arguments.

### I. *The Governing Law*

█ Our state and federal Constitutions prohibit the state from depriving any person of life, liberty, or property without due process of law. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7.) In *Lawrence, supra*, 44 Cal.4th 1181, the Supreme Court provided a comprehensive summary of our laws regarding parole. █ The court made clear that the Board exercises great discretion in its parole determinations, but that this exercise is not unbounded: "The applicable statutes provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. ([Pen. Code,] §§ 3040, 5075 et seq.) The Board's parole decisions are governed by section 3041 and title 15, section 2281 . . . (Regs., § 2230 et seq.). Pursuant to statute, the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide

uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public* . . . .' ([Pen. Code,] § 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the *public safety* requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' (Italics added; see [*In re Rosenkrantz* (2002) 29 Cal.4th 616,] 654 [128 Cal.Rptr.2d 104, 59 P.3d 174].)" (*Lawrence, supra,* 44 Cal.4th at pp. 1201–1202, fn. omitted.)

As the Supreme Court explained in *Lawrence,* California Code of Regulations, title 15, section 2402, is virtually identical to title 15, section 2281,[3] the parole suitability regulation followed in *Lawrence.* (*Lawrence, supra,* 44 Cal.4th at p. 1201, fn. 5.) The only difference is that Regulations section 2402 provides parole consideration criteria and guidelines for murders committed on or after November 8, 1978. (*Lawrence,* at p. 1201, fn. 5.) Regulations section 2402 controls here because Juarez murdered Farley in 1982.

Regulations section 2402 sets forth the factors to be considered by the Board in carrying out the mandate of Penal Code section 3041. The regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).) The regulation also lists several circumstances relating to *unsuitability* for parole and the mitigating circumstances of the crime. (Regs., § 2402, subds. (c), (d).) Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (*Ibid.*; see *Lawrence, supra,* 44 Cal.4th at pp. 1201–1203 [summarizing Regs., § 2281].)

The factors listed in Regulations section 2402 include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability."

---

[3] We refer to the California Code of Regulations as Regulations. All further references to the Regulations are to title 15, unless otherwise specified.

(Regs., § 2402, subd. (b); see *Lawrence, supra,* 44 Cal.4th at p. 1202, fn. 6 [summarizing Regs., § 2281, subd. (b)].)

Unsuitability factors stated in Regulations section 2402, subdivision (c), are (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "Previous Record of Violence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "Sadistic Sexual Offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)–(6); see *Lawrence, supra,* 44 Cal.4th at p. 1202, fn. 7 [summarizing Regs., § 2281, subd. (c)].)

Suitability factors stated in Regulations section 2402, subdivision (d), are (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "The prisoner's present age reduces the probability of recidivism"; (8) "The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9); see *Lawrence, supra,* 44 Cal.4th at p. 1203, fn. 8 [summarizing Regs., § 2281, subd. (d)].)

■ In *Lawrence*, the Supreme Court clarified that a decision to deny parole must be based upon "some evidence" of current dangerousness. (*Lawrence, supra,* 44 Cal.4th at p. 1212.) As the court explained in a companion case it issued on the same day as *Lawrence, In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), it determined in *Lawrence* that, "the aggravated nature of a commitment offense does not, in every case, provide relevant evidence that an inmate remains dangerous, and a focus upon the egregiousness of the commitment offense to the exclusion of other relevant evidence has proved in practice to obscure the core statutory emphasis upon *current* dangerousness . . . . [¶] Accordingly, '. . . *the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.'* " (*Shaputis,* at pp. 1254–1255, italics added.)

The *Lawrence* court explained that, while we are to conduct a deferential standard of review which credits findings supported by a "modicum of

evidence," this "does not mean . . . that evidence suggesting a commitment offense was 'especially heinous' or 'particularly egregious' will eternally provide adequate support for a decision that an inmate is unsuitable for parole. . . . [T]he Legislature specifically contemplated both that the Board 'shall normally' grant a parole date, and that the passage of time and the related changes in a prisoner's mental attitude and demeanor are probative of the determination of current dangerousness." (*Lawrence, supra*, 44 Cal.4th at p. 1226.)

In other words, as we have previously held, the exceedingly deferential nature of the "some evidence" standard does not convert us " 'into a potted plant.' " (*Lawrence, supra*, 44 Cal.4th at p. 1212, quoting *In re Scott* (2004) 119 Cal.App.4th 871, 898 [15 Cal.Rptr.3d 32].) We must ensure that the denial of parole is based on "some evidence" of current dangerousness. "[S]uch evidence ' "must have some indicia of reliability." ' " (*Scott*, at p. 899.) "[T]he 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905].)

Furthermore, "the paramount consideration . . . under the governing statutes is whether the inmate currently poses a threat to public safety and thus may not be released on parole." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) Thus, as the *Lawrence* court explained " *'due consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness.* 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.' " (*Ibid.*, italics added.) As Justice Moreno stated neatly in his concurring opinion in *Lawrence*: "a parole date *shall* normally be granted *except when some evidence of current dangerousness, after considering the totality of the circumstances*, justifies denial of parole." (*Id.* at p. 1230 (conc. opn. of Moreno, J.), italics added.)[4]

## II. *Suitability Factors*

In announcing the Board's decision, the presiding commissioner acknowledged some of the factors indicating that Juarez was suitable for parole. She stated that there was "no question that [Juarez's] institutional behavior in recent years has been exceptional," that his classification score had been at a

---

[4] Justice Moreno's concurrence is particularly notable because *Lawrence* was determined by a four-to-three vote.

minimum since 2003, that he had worked in the optical lab since 1998 and that all his work reports had been excellent, that he was a certified optician working on advance certification, had three other vocational certifications, was an active member of the Catholic church, had participated in "a lot of self-help," including AA, had been discipline free for the 15 years prior to the hearing, had received a favorable psychological evaluation assessing him at a low risk for violence recidivism if released into the community, had multiple choices of residence, a supportive family, two job offers, marketable skills, and an AA sponsor on the outside.

However, the presiding commissioner almost completely ignored one of the most significant suitability factors, without disputing it, that being Juarez's expression of remorse for the commitment offense, for which he took full responsibility. (See Regs., § 2402, subd. (d)(3) [regarding the expression of remorse].) She made only a passing reference to Juarez's taking responsibility for his past criminal conduct, and otherwise ignored his admission that he knowingly smoked PCP and drove his car, his acknowledgement that he was responsible for Farley's death, and Bowerman's report of his insight into the crime and expression of remorse. Although the presiding commissioner referred to the role of PCP in the commitment offense, she said nothing about Juarez's admission that he was an alcoholic and drug addict.

Juarez's taking responsibility is apparent. While he told the probation department in 1982 that he could not remember what had happened after he smoked a marijuana cigarette, and did not know that the cigarette contained PCP, he told the Board in 2008 that he knew at the time that the marijuana cigarette contained PCP, and remembered that he nonetheless got into his car and drove off, losing his recall of what happened only after he had driven about a block. Furthermore, he told the Board, "I take full responsibility for the crime because I know I was driving; I know I shouldn't have been that day simply because I didn't have a driver's license. But I know I committed the crime. There wasn't anybody else in the car driving but me, and I'm responsible for that death of Mr. Farley." He acknowledged that at the time he was "loaded, stoned all the time," that his substance abuse "destroyed my life and I took an innocent life also. I destroyed a lot of people. Probably with my erratic driving, the other people probably were really scared, but today I know I don't need alcohol or drugs anymore."

The presiding commissioner's virtual silence regarding these matters is one indication that the Board failed to give the requisite individualized consideration to Juarez's case. This failure becomes even more apparent when we review the Board's discussion of the reasons it relied on to deny parole.

### III. *Unsuitability Factors*

The Board's decision, rather than demonstrating that it gave the requisite individualized consideration to Juarez's case, was based on the presiding commissioner's rote recitation of unsuitability factors that were at odds with the record and ignored material suitability factors. The Board also did not articulate a rational nexus between the three reasons it relied on and any current dangerousness. We conclude that none exists.[5]

### A. *Credibility*

The Board denied Juarez parole in significant part because, given his claimed inability to recall all of the details of his 1982 commitment offense and of his 1981 shooting and reckless driving incident, his "credibility" was "at stake" and continued "to be in question." Juarez argues that, given that he has taken responsibility for the commitment offense and the substance abuse that caused it, his lack of memory is not probative of current dangerousness. We agree.

The Board's reliance on its "questions" about Juarez's ability to recall events is particularly surprising because it announced its decision shortly after rejecting Juarez's requests that it further investigate his blackout claim before ruling. The presiding commissioner, at the urging of the assistant district attorney, rejected this request because "what was at issue was the malice and callous and conscious disregard for the lives of countless others by driving under the influence of PCP." When Juarez's attorney argued that his parole suitability could be affected by whether Juarez drove to evade the police or was on "automatic pilot," the presiding commissioner disagreed, stating that "If [Juarez] knew when he took that hit [of the PCP-laced marijuana cigarette] that he was placing himself in harm's way, in jeopardy, and placing others who were under his care in harm's way, which he was, then I don't see that there is anything so different about those two."

Nonetheless, in announcing the Board's ruling, the presiding commissioner, referring to Juarez's inability to remember certain facts, stated that the Board "cannot solve this dilemma, this apparent dilemma for you," and referred him to further psychological evaluation. The Board did not do so in order to resolve whether or not Juarez had blacked out as he claimed, but so that Juarez could "take hold of this and attempt to discuss with your clinician whenever you are interviewed again what you can do to resolve this situation where you seem unable to remember not only the commitment offense, but a

---

[5] We note that the Board, having issued its decision prior to the publication of *Lawrence, supra,* 44 Cal.4th 1181, did not have the benefit of the Supreme Court's clarifications.

considerable amount of your criminal history. It seems as though whenever you have a problem, then suddenly you have a loss of memory. That's very suspicious on the face of it, sir, and at times whenever you didn't have a concussion, when you weren't smoking PCP, so that brings the whole issue into question as well."

We reject the Board's reliance on its questions about Juarez's credibility for three reasons. First, the presiding commissioner mischaracterized Juarez's lack of memory when she stated that "whenever you have a problem, then suddenly you have a loss of memory." The Board did not ask Juarez about much of his prior criminal history. Rather, it asked him specifically about his previously stated lack of memory of the events related to his 1981 reckless driving conviction, and Juarez acknowledged that he could not recall them. Juarez did not claim that he lacked a memory of the other five incidents that led to misdemeanor convictions.

Second, the presiding commissioner suggested that Juarez was without an explanation for his lack of recall regarding the 1981 incident because he had not suffered a concussion or smoked PCP during this incident. In doing so, the presiding commissioner completely ignored Juarez's explanation for that prior blackout, which was that he was drunk, despite acknowledging that he took responsibility for the incident. There was no evidence to contradict this, nor was it disputed that Juarez had a serious drinking problem during this period.

Third, the presiding commissioner did not explain what suitability factor was implicated by the Board's questions about Juarez's credibility. We fail to see how it could be relevant to any suitability factor in light of Juarez's full acceptance of responsibility for the commitment offense, his prior crime, and his substance abuse.

The Board's denial of parole because of Juarez's lack of memory is similar to the Board's denial discussed in *Palermo, supra,* 171 Cal.App.4th 1096, in which the Third Appellate District granted relief to a habeas corpus petitioner who challenged the Board's denial of parole, which denial was in part because the petitioner had continued to insist that he had accidentally shot his girlfriend with his gun. (*Id.* at pp. 1110–1111.) The appellate court concluded that "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And . . . defendant accepted 'full responsibility' for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing

insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety." (*Id.* at p. 1112.)

The Board's denial in the present case is even more egregious than that discussed in *Palermo, supra,* 171 Cal.App.4th 1096, because Juarez readily admitted that he knowingly drove under the influence of PCP, marijuana and alcohol, did not dispute any of the facts of the crime, and took full responsibility for killing Farley. We fail to see the relevance of the Board's questions in light of these undisputed facts, particularly in light of the Board's own conclusion at the same time that Juarez's blackout claim was not dispositive of his case, could not be determined on the merits, and deserved no further investigation. To add insult to injury, the presiding commissioner instructed him to solve his "dilemma" of no memory with the aid of a psychiatrist. By doing so, the Board has placed Juarez in a perpetual limbo that turns on its head the rule that a prisoner in Juarez's circumstances "*shall* normally be granted" parole "*except*" when there is some evidence of current dangerousness that justifies denial. (*Lawrence, supra,* 44 Cal.4th at p. 1230 (conc. opn. of Moreno, J.), italics added.) The Board in effect is requiring that Juarez, in order to win his release, either state a memory or prove he cannot, which the Board has concluded cannot be proven and has no bearing on his parole suitability. This makes no sense whatsoever. The Board's reliance on its "questions" regarding Juarez's "credibility" was an abuse of discretion that denied Juarez due process rights as much as, or more than, did the Board's insistence that Palermo admit he acted intentionally to kill his girlfriend in *Palermo.*

The Board is certainly entitled to rely on a finding that a prisoner lacks credibility (again, the Board only "questioned" Juarez's credibility here) to deny parole after it considers the individualized circumstances of a case. Such a finding can be relevant to a determination of a prisoner's current dangerousness, such as when the prisoner asserts that he did not engage in criminal or other relevant misconduct despite evidence to the contrary. However, Juarez's failure to recall the details of his commitment offense or certain previous criminal activities has no bearing on his current dangerousness in light of his taking responsibility for the crime and his substance abuse problems, the sincerity of which is *not* disputed. As the assistant district attorney stated at the Board hearing, Juarez's failure to recall the

details of the commitment offense "is not dispositive of anything." The Board should not have relied on its questions about Juarez's credibility to deny him parole.[6]

### B. *Especially Heinous, Cruel, and Callous Crime*

The Board also based its denial on its conclusion that Juarez carried out the commitment offense in "an especially heinous, cruel and callous manner." There is no evidence to support this conclusion, nor a rational nexus between the nature of the commitment offense and any current dangerousness.

*Lawrence* and *Shaputis* make clear that " 'the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.' " (*Shaputis, supra,* 44 Cal.4th at p. 1255, quoting *Lawrence, supra,* 44 Cal.4th at p. 1221.) "[T]he statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Lawrence,* at p. 1211.)

Juarez's actions, while certainly criminal and reckless, were not committed in an especially heinous, cruel, or callous manner that is probative of his current dangerousness. To the contrary, all of the evidence indicates that 27 years ago, as a young man who was out of control and a repeated substance abuser, Juarez killed an innocent man because he drove, and sped away from police, impaired by PCP and other substances, after he had been warned about driving under the influence of PCP. His inexcusable conduct was sufficient support for his second degree murder conviction, but we fail to see how it was more egregious than that. Unfortunately, it is all too common that individuals who know better drive while impaired. There was nothing "especially heinous, cruel and callous" about Juarez doing so. There was, for example, no evidence that he acted in a calculated fashion, terrorized or injured anyone, or acted to gratuitously increase anyone's pain or suffering. (See *In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655] [referring to these indicators in rejecting an argument that a defendant who murdered his wife by shooting her in the head acted with " '*exceptionally* callous disregard for human suffering' "].)

---

[6] In view of our determinations, we do not address the other arguments made by the parties, including Juarez's contention that he in effect exercised his right under Regulations section 2236 not to discuss the facts of the commitment offense by his failure of memory.

The Board, rather than discuss Juarez's substance abuse, his years of sobriety and participation in recovery programs, and his plans to remain sober upon release, engaged in a rote recitation of the unsuitability factors listed in Regulations section 2402, subdivision (c)(1), that made little sense under the circumstances and were contradicted by the record. First, the Board, after noting that Juarez drove his vehicle while taking PCP, stated that multiple victims had been "attacked or killed in the same incident." While there were multiple victims in the collisions caused by Juarez on the day in question, there is no evidence that he "attacked" anyone.

The Board next referred to Juarez's increasing his speed after being pursued by police, his failure to negotiate a curve in the road, his crossing over into a lane and striking Farley's vehicle, causing Farley's death, that Farley's body was "mutilated," that Juarez was observed as conscious, alert, and oriented after the collisions, that he was found to have a 30-nanogram level of PCP in his blood, that he had tested positive for PCP use multiple times in the past, that the first two victims had been "traumatized," that Farley was "particularly vulnerable" because he could not avoid the collision, and that Juarez had put public safety at risk by his actions and was driving with a suspended license. The Board concluded from this confused recitation of facts that Juarez had carried out his commitment offense "in a manner demonstrating exceptionally callous disregard for human suffering."

We disagree because the only evidence in the record indicates that the collision was an accident, albeit one caused by Juarez's driving under the influence, despite knowing the hazards involved. The 1982 parole department report stated that he was *"unable to negotiate the curve* and he went across the double yellow lines into the oncoming lanes . . . where he struck the vehicle driven by the victim, Bruce Farley."* (Italics added.) As we have already indicated, Juarez admitted, and accepted responsibility for, what the assistant district attorney told the Board was the "crime," which she argued "occurred at the point that he ingested the PCP with knowledge of what its potential consequences were and with the driving history that he had and then got behind the wheel and drove."

The Board's failure to consider the individualized circumstances of Juarez's case is most evident in the presiding commissioner's next statement. After referring to Juarez's claimed blackout, she stated that "[t]he motive for this crime is inexplicable to this day. Why you did that is still inexplicable, and you have not explained that to this panel, sir. You had been counseled numerous times for driving under the influence. Law enforcement officers' report noted that earlier that day when a friend exited the car, because of your erratic driving, you tried to run him down with your car, then you fired three gunshots at him from the car. You have taken responsibility for this, sir, but

you say you have no memory of that either." This statement is bewildering because the reason for the crime is apparent, and was readily acknowledged by Juarez at the hearing. That is, he was a repeated substance abuser who knowingly drove his car under the influence of impairing substances, after he had been counseled about the hazards of doing so. Therefore, there is no evidentiary support for this "motive" concern.

The presiding commissioner, compounding the Board's error regarding "motive," also indicated by her statement that the Board incorrectly found that earlier on the day of Farley's murder, Juarez had fired gunshots at his friend. In fact, this incident occurred the previous year.

Finally, the Board relied on its conclusion that Juarez's "credibility" was "in question" because of his claim that he could not remember what happened after he drove about a block while high on PCP, or during the 1981 incident. As we have already discussed, the Board could not rely on these questions to deny parole.

In short, we find no evidentiary support for the Board's conclusion that Juarez committed the commitment offense in a manner that was especially heinous, cruel, or callous. Even if there were evidence that he did so, we conclude, as did the *Lawrence* court, that "[i]n light of petitioner's extraordinary rehabilitative efforts specifically tailored to address the circumstances that led to [his] criminality, [his] insight into [his] past criminal behavior, [his] expressions of remorse, [his] realistic parole plans, [and the] support of [his] family . . . that the unchanging factor of the gravity of petitioner's commitment offense has no predictive value regarding [his] *current* threat to public safety, and thus provides no support for the . . . conclusion that petitioner is unsuitable for parole at the present time." (*Lawrence, supra*, 44 Cal.4th at p. 1226.)

## C.  *Prior Criminal History*

The Board also denied Juarez parole because of his "history of violence and assaults and prior criminality that do show an escalating pattern of criminal conduct." Juarez argues that his prior criminal history does not support the conclusion that he is currently dangerous. We agree. Once more, the Board engaged in a rote recitation of an unsuitability factor rather than give individualized consideration to the record before it. As stated in the 1982 probation report, "[i]n essence, [Juarez's] record can be described as one of a very negligent motor vehicle operator."

Under the pertinent regulations, the fact that a prisoner has a previous record of violence, such as the previous infliction of serious injury to a victim

or a demonstration of serious assaultive behavior at an early age, tends to show that a prisoner is unsuitable for parole. (Regs., § 2402, subd. (c)(2).) On the other hand, when a prisoner "lacks any significant history of violent crime," this tends to show that the prisoner is suitable for parole. (*Id.*, subd. (d)(6).) Therefore, past criminal history is relevant to the determination of a prisoner's suitability for parole. (*Id.*, subd. (b).)

The presiding commissioner stated, "Included in your history is resisting a peace officer, drunk driving, assault and battery, hit and run, drunk in public, reckless driving, and joyriding. You were on probation, in fact, at the time of the commitment offense. So you've suffered adult probation and time in the county jail." She did not provide any further explanation for the Board's conclusion that Juarez's prior criminal history was a basis for denying him parole.[7] We conclude that it is not.

It is apparent from the evidence and the presiding commissioner's recitation that Juarez's prior criminal history does not have any probative value regarding his current dangerousness. According to the probation department report, Juarez was involved in six incidents from 1977 to 1981, when he was about 18 to 22 years of age, which led to various misdemeanor convictions. Two of these six incidents involved substance abuse, Juarez told the Board he was drunk during a third, and the record indicates that he tested positive for PCP repeatedly while on probation during part of this time. While the incidents were not without violence, including his firing of a gun on one occasion and his punching of a woman on another, they tend to be similar in nature, for the most part involving reckless behavior under the influence of an impairing substance and belligerent behavior when confronted by police. They do not demonstrate an escalating pattern of criminal behavior or a significant history of violent crime. Rather, they demonstrate, as the probation department concluded in 1982, the dangers of a reckless, relatively young alcoholic and drug addict getting behind the wheel of a car. There is not a rational nexus between this prior criminal history and Juarez's current dangerousness.

---

[7] Juarez has no juvenile criminal record. The presiding commissioner, in referring to Juarez's criminal history, stated that he had engaged in illegal activity from an early age, relying on Juarez's own testimony that he began using marijuana at the age of 12, and drank to get drunk at the age of 14 or 15. She continued, "So you were just behaving in a reckless manner at a very young age." It is unclear if the Board relied on this activity for its finding that his prior criminal history rendered him unsuitable for parole. If it did, it was improper because the focus of the past criminal history regulations is on a "significant history of violent crime," which is absent from this part of Juarez's history.

## IV. *Remedy*

Juarez argues that we should order his immediate release and impose a sentence consistent with his being granted parole on July 29, 2008, the date of his suitability hearing, because there is no evidence to support the Board's decision. The Attorney General argues that the proper remedy is to order a new parole consideration hearing before the Board so that it may exercise its executive authority to determine whether Juarez is suitable for parole. Under the circumstances of this case, we order the Board to vacate its decision, issue a new order granting Juarez his release, and set the appropriate sentence in order to do so.

■ As Juarez points out, in *Lawrence, supra*, 44 Cal.4th 1181, the Supreme Court affirmed the judgment of the appellate court. (*Id.* at p. 1229.) The appellate court determined that there was no evidence of current dangerousness to support the Governor's reversal of the Board's grant of parole decision and, accordingly, "issued a writ vacating the Governor's reversal . . . and reinstated the Board's . . . grant of parole" without remand to the Governor. (*Id.* at p. 1201.) Furthermore, after the appellate court had reinstated the Board's grant of parole, the petitioner was released on parole during the subsequent litigation. (*Ibid.*) The *Lawrence* court subsequently declined to issue a writ of supersedeas to stay the order of release as requested by the Attorney General. (*Ibid.*) Therefore, *Lawrence* indicates that when there is no evidence in the record showing current dangerousness, a remand to the Board or Governor for further consideration would serve no purpose.

The Attorney General argues that, given the Board's broad discretion in parole suitability decisions, we should be " 'reluctant to direct a particular result' " and that the Board " 'must be given every opportunity to lawfully exercise its discretion' " over parole matters, quoting from *In re Ramirez* (2001) 94 Cal.App.4th 549, 572 [114 Cal.Rptr.2d 381], disapproved on another ground in *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100 [23 Cal.Rptr.3d 417, 104 P.3d 783]. However, *Ramirez*, issued before *Lawrence, supra*, 44 Cal.4th 1181, determined that a further hearing was necessary because the court would otherwise be reweighing the evidence. (*Ibid.*) We have determined that there is *no* evidence in the record to support denial.

A number of appellate courts have recently ruled in accordance with the approach taken in *Lawrence, supra*, 44 Cal.4th 1181. In *Palermo, supra*, 171 Cal.App.4th 1096, *In re Singler* (2008) 169 Cal.App.4th 1227 [87 Cal.Rptr.3d 319], *In re Rico* (2009) 171 Cal.App.4th 659 [89 Cal.Rptr.3d 866], and *In re Gaul* (2009) 170 Cal.App.4th 20 [87 Cal.Rptr.3d 736], the courts, upon granting the petition for writ of habeas corpus, each directed the Board to

hold a new hearing and find the petitioner suitable for parole, unless new evidence subsequent to the previous hearing indicated his release posed an unreasonable risk of danger to society. (*Palermo*, at pp. 1112–1113; *Singler*, at p. 1245; *Rico*, at p. 688; *Gaul*, at p. 40.) We conclude that this is the appropriate remedy under the circumstances of this case.

## DISPOSITION

The petition for writ of habeas corpus is granted. The Board is directed to hold a hearing within 30 days of the finality of this decision, find Juarez suitable for parole, and set sentence appropriate to this determination, unless new evidence of his conduct and/or change in mental state subsequent to the 2008 parole hearing is introduced and is sufficient to support a finding that he currently poses an unreasonable risk of danger to society if released on parole. Pursuant to California Rules of Court, rule 8.387(b)(3)(A), this opinion shall be final as to this court within five days after it is filed.

Kline, P. J., and Haerle, J., concurred.